5-1761                                        323 S. W. 2d 917

Opinion delivered May 4, 1959.

[Rehearing denied June 1, 1959]

*Murphy & Burch* and *Jeff Duty,* for appellant.

*Greenhaw & Greenhaw, Rex W. Perkins* and *Thomas Pearson,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Beatrice Hargis, and appellees, husband and wife, are residents of Madison County. On June 2, 1957, Mrs. Hargis and Mrs. Horrine engaged in a physical altercation, following a fight between their husbands. Subsequently, appellant instituted suit against both appellees, alleging that each of the appellees assaulted her, inflicted painful and permanent injuries to her body, and prayed judg-

ment against Horrine and wife, jointly and severally, in the amount of $11,000. A general denial was filed by the Horrines, and the cause proceeded to trial on February 20, 1958. The jury returned a verdict for appellees, and the court entered its judgment dismissing the complaint. From such judgment, comes this appeal. Only one point is raised in urging a reversal, *viz.*, "The court was in error in the giving of Instruction No. 6."

The proof reflected that the two families were neighbors, and had previously disagreed about some property lines. On June 2nd, Hargis was riding on his horse, and Horrine stopped him in the road. After some words, the two engaged in a fight, in which Hargis was worsted. According to Horrine's testimony, appellant arrived upon the scene and said:

" 'What did this fight start over?' And I said, 'He called me a —— —— son-of-a———.' And she said, Mrs. Hargis says, 'He never called you no son-of-a———.' And I said, 'Yes, he did.' I said, 'Mrs. Horrine heard him.' And she said, 'Well, Mrs. Horrine's just a liar', she said, 'when she heard him call you son-of-a———.' And I said, 'I bet you won't tell her that to her face.' And she said, 'I'll tell her that to her face.' And when she said that, well, just about a minute, why, I looked across the hill, and Mrs. Horrine was coming down the hill, a-carrying the baby, and she come up with the baby and handed the baby to my oldest boy, and she said, 'Here, Doyle, you take care of this baby.' And she come on up, and she said, 'Don't you call me a liar.' And Mrs. Hargis said, 'Who called you a liar? I didn't call you no liar.' And I said, 'Why, you did. You just now called her one.' She said, 'Well, all right, then.' Mrs. Horrine said, 'I know you did; I heard you.' And Mrs. Horrine started on up the hill where she was, and Mrs. Hargis came a-meeting her, and when they met, why, Mrs. Hargis grabbed into her hair, and Mrs. Horrine hit her. Mrs. Hargis shoved her down the hill and fell down the hill, and Mrs. Hargis landed on top. Mrs. Horrine's head was just about at Mrs. Hargis's breast. Mrs. Hargis fell right on over, with her head into the ground, and they just scrambled around there for a while, and Mrs. Har-

gis had her hair, and Mrs. Horrine had grabbed her by the hair, and they was pulling hair right there on the ground. They scrambled around there a while, and Mrs. Horrine come on top, and when she come on top, why, she went to slapping her, and they went to pulling hair again, and when they went to pulling hair again, why, Mrs. Hargis said, 'Kate, let me up.' "

Mrs. Hargis testified that Horrine either hit her with a rock or handed one to his wife. Horrine denied this, though he stated that he picked up a rock because Mr. Hargis had done likewise. According to Horrine, he and Hargis stood there, side by side, and "let them fight it out." The only eye witnesses to the occurrence were the Hargises, and the appellees and their son, Doyle. Conflicting versions were offered by the participants as to who started the trouble, but Doyle testified:

"*  *  * So Dad said, 'You'll not call Mom a liar to her face.' And she said, 'I'll call Kate a liar to her face.' And Dad said, 'I wish she was here right now,' and he looked around and seen Mom a-coming, and when she got there, Dad said, 'You call Kate a liar, now.' And she said, 'Why, did I call her a liar? I never called Kate no liar.' Mom said, 'I know you did,' she said, 'I heard you.' She went on a-meeting her, Beatrice came a-meeting her and she rushed out and grabbed Mama by the hair of her head. About time she grabbed Mama by the hair of the head, Mama hit her."

After the encounter, appellant was examined by Dr. Charles Beebe, who testified that she was bleeding profusely from a scalp wound; that he took 7 or 8 stitches, and continued to treat her, giving appellant a shot of estrogen every two weeeks; that in his opinion, she had a permanent nerve injury. Wilda Wilson, a nurse at Washington County Hospital, stated that Mrs. Hargis appeared to be in pain and was unconscious when she went in to take care of her; "*  *  * her head was hurt. It was bandaged; I couldn't see that, but she was black and blue just all over." Dr. Jeff Baggett testified that in his opinion, appellant suffered a brain injury as a result of the fight.

At the conclusion of the testimony, the court instructed the jury as to the applicable law; included in such instructions was Instruction No. 6, which is alleged by appellant to be inherently wrong, and prejudicial error. Instruction No. 6 reads as follows:

"You are further told that the testimony is in dispute as to whether or not Woodrow Horrine touched or assisted in the assault between Beatrice Hargis and Kate Horrine. Before Woodrow Horrine could be held liable, it is necessary that you find he actually assaulted, that is, physically touched, the body of Beatrice Hargis during this foray, or that he aided or encouraged or assisted, in some direct manner, the assault being made by Kate Horrine. Now, there is testimony that is in dispute there as to just what part Woodrow Horrine played. It is up to you to determine the truth, who to believe and who not to believe. *If you find that he did not physically touch the body of Beatrice Hargis during this altercation, or that he did not hand anything to Kate Horrine as a means of furthering the controversy, you will have to find for Woodrow Horrine, because he would actually have to have touched the plaintiff or been a direct means whereby the defendant, Kate Horrine, could further her assault such as handing her something in the furtherance of her assault. Mere words, on his part, yelling or encouraging, would not be sufficient to justify a verdict against him.*"[1]

The italicized portion of the instruction was certainly erroneous. As stated in American Jurisprudence, Vol. 4, Sec. 4, page 127:

"Liability for an assault or assault and battery is not necessarily restricted to the actual participants; any person who is present, encouraging or inciting an assault and battery by words, gestures, looks, or signs, or who by any means approves the same, is in law deemed to be an aider and abettor and liable as a principal. Such a person assumes the consequences of the act to its full extent as much as the party who does the deed."

[1] Emphasis supplied.

See also *Corpus Juris Secundum*, Vol. 6, Sec. 27, page 830. Numerous cases are cited in both of these authoritative works in support of this principle of law. Appellees contend, however, that even though the instruction be erroneous, the matter became moot when the jury returned their verdict in favor of Mrs. Horrine; *i.e.*, Woodrow Horrine could not be guilty of an unlawful act if Kate Horrine was found blameless. In other words, the jury found that Mrs. Horrine was not guilty of an assault, and Mr. Horrine, accordingly, could only have encouraged an innocent party. As stated in their brief, "Under these circumstances, how could one who is alleged to have assisted and aided the active participant in an assault be guilty of such aid and encouragement when the active participant has been absolved of all liability therein?" While this argument, at first blush, seems rather logical, we are convinced, after a study of numerous cases, that such position is unsound and without merit. Woodrow Horrine's possible liability was not secondary to that of Mrs. Horrine, *i.e., it was not derived from, nor dependent upon Mrs. Horrine's alleged culpability.* As stated in *Corpus Juris Secundum*, Vol. 6, Sec. 27, page 832:

"No joint damages can be assessed against one of several defendants to a joint assault for anything which occurred before his participation therein, but the failure to prove a joint liability in a joint action for assault and battery will not defeat a recovery against any one or more proved guilty; so that one of defendants was justified in his attack on plaintiff, does not of itself absolve the other defendants."

We are of the view that the jury could, had it been given the proper instruction, and so desired, have cleared Mrs. Horrine of liability and still found against the husband. Each could have been held liable, independent of the acts of the other. For instance, the jury could have found that Mrs. Horrine, in good faith, thought that she was about to be attacked, and defended herself, or even that Mrs. Hargis struck the first blow — or being unable to determine which was the aggressor, found for the defendant (appellee). Though reaching this conclusion, the

jury still could have rendered a verdict against Mr. Horrine, finding that he encouraged and prompted his wife to enter the affray, when he could have as easily sent her back home. Certainly it is not beyond the realm of possibility that the jury, if properly instructed, could have found the injuries suffered by Mrs. Hargis resulted from the "sicking on" of his wife by Woodrow Horrine. We find this view many times expressed. In *Knott* v. *Litton*, (La.) 81 So. 2d 124, Mrs. Knott brought suit against David Litton and wife for injuries sustained from being beaten with a stick by Mrs. Litton. Due to illness of Mrs. Litton at the time of trial, a continuance was granted to her, and the case proceeded against Mr. Litton. The proof reflected that Litton and Mrs. Knott were arguing about the fact that Litton's cattle had been running on Mrs. Knott's property. Litton proceeded to "bawl her out", and threatened to kill her dog. It was established he made the statement that if she were a man or he a woman, he would whip her. Litton proceeded to his residence, and returned in a few minutes with his wife, who picked up a green sweet gum sprout, several feet long, and beat Mrs. Knott over the body. When neighboring ladies attempted to come to Mrs. Knott's assistance, Mr. Litton told the ladies to "leave them alone." Judgment was rendered against Litton, and the Louisiana Supreme court, in affirming, stated:

"The conclusion is inescapable that Litton became inflamed with anger during his conversation with Mrs. Knott, following which he went home and got his wife for the precise purpose of doing just what she did. * * * Neither is there any question but what David Litton wilfully and maliciously incited, encouraged and induced his wife to attack plaintiff."

In our own case of *Gordon* v. *McLearn*, 123 Ark. 496, 185 S. W. 803, the McLearn brothers instituted suit against Gordon and R. B. Malin for malicious prosecution, it being alleged that Gordon and Malin conspired together to cause the arrest and prosecution of appellees on the false charge of having removed and disposed of two bales of cotton, upon which Gordon held a landlord's lien. Appellees' proof reflected that the McLearns sold the bales

of cotton to Malin, and Gordon represented to Malin that the cotton was subject to his lien, and he had forbidden the removal of same until his rent was paid. Gordon and Malin went together to the Justice of Peace, who issued the warrant of arrest, though only Malin signed the affidavit for warrant. The McLearns were arrested. Malin became convinced that appellees had committed no wrong, and so advised the prosecuting attorney, who ordered dismissal of the criminal charge. The jury returned a verdict in favor of Malin, but rendered judgment against Gordon. Gordon appealed, contending that the verdict of the jury in Malin's favor required his own discharge as well. In rejecting such contention, this Court said:

"But the individual liability did not depend upon the proof of the existence of a conspiracy. At least two persons must be guilty to constitute an unlawful conspiracy, whereas one person alone may be guilty of conduct which furnishes the foundation for an action for malicious prosecution, even though such person induces another to set the machinery of the law in motion. The court submitted these questions to the jury under appropriate instructions, and the jury was told the circumstances under which one or the other or both of the defendants might be held liable. Here the jury had evidence to support its finding that appellant alone was liable for this prosecution, and their verdict in Malin's favor shows that they so found. It is true Malin signed the affidavit and appellant did not do so. But this fact does not necessarily make one liable, nor does it necessarily excuse the other. Malin may have been excused by the jury because of a finding in his favor that he had probable cause, or was not prompted by malice, or was justified in acting upon the advice of counsel; but the proof did not also require a finding in appellant's favor because Malin was exonerated from blame, nor because appellant did not actually make the affidavit."

See also *Haughton* v. *Pierce Petroleum Corp.*, 178 Ark. 917, 13 S. W. 2d 26. In *Leech* v. *Missouri Pacific Railroad Company,* 189 Ark. 161, 71 S. W. 2d 467, Mrs. Leech brought suit in her representative capacity against ap-

pellee, seeking damages in the amount of $45,000 for the benefit of herself, as widow, and her son, and for $5,000 for the benefit of the estate of her deceased husband, alleging that her husband's death was caused by the negligence of appellee. The jury returned a verdict for the benefit of the estate in the sum of $3,750, but made no further finding. A judgment was accordingly entered for that amount, but the judgment further provided:

"It is further considered, ordered and adjudged that no finding was made by the jury upon the cause of action for the benefit of the widow and child of the deceased. It is therefore considered, ordered and adjudged that the plaintiff take nothing upon her cause of action for the benefit of the widow and child of the deceased." In an Opinion written by the late Mr. Justice HUMPHREYS, this Court said:

"Appellant contends that two causes of action were alleged, which is conceded by appellee, and that she was entitled to a verdict as well upon her cause of action for the benefit of herself and son as upon her cause of action for the benefit of the estate, and that it was error not to require the jury to return a verdict for a substantial amount for the benefit of herself and son. It is argued that in order to find a verdict for the benefit of the estate it was necessary for the jury to find that appellee and Graham were negligent and that deceased was not. This is true, and the verdict on behalf of the estate is supported by sufficient evidence, as there was testimony tending to show these facts. It does not follow, however, that because two separate and distinct causes of action are tried by the same jury the finding of facts in one cause is binding on the jury in the other cause of action if there is a dispute in the testimony. Although there was evidence tending to show concurrent negligence on the part of Graham and appellee and no negligence on the part of deceased, yet there was evidence tending to show no negligence on the part of appellee, and the jury was at liberty to so find in the cause of action on behalf of appellant for the benefit of herself and son, as much so as if the two causes of action had been tried separately instead of together. Notwithstanding the

510

causes of action may be tried together under the provisions of the statute, they are wholly independent of each other, and the finding of the jury in one is not binding upon the jury in the other if the facts are in dispute, as they were in this case.''

See also *Milum* v. *Clark,* 225 Ark. 1040, 287 S. W. 2d 460.

The facts in the instant litigation were in dispute, and under these holdings, we think the jury could have found either for or against the husband or wife, though reaching a contrary verdict as to the liability of each. The court's erroneous instruction could have prevented any verdict against Mr. Horrine, and it is our duty to reverse unless it clearly appears that the error was harmless. *Conway* v. *Coursey,* 110 Ark. 557, 161 S. W. 1030. As was held in *Neal* v. *Brandon,* 70 Ark. 79, 66 S. W. 200, an erroneous instruction is presumed to have been prejudicial until the contrary is shown.

The judgment in favor of Kate Horrine is affirmed, but it is reversed as to Woodrow Horrine, and the cause remanded for further proceedings not inconsistent with this opinion.