CITY NATIONAL BANK of Fort Smith *v.* Larry J. GOODWIN and Sandra J. Goodwin

89-259                                                                 783 S.W.2d 335

Supreme Court of Arkansas
Opinion delivered January 29, 1990

184

*Harper, Young, Smith & Maurras*, by: *S. Walton Maurras*, for appellant.

*Jack Skinner*, for appellee.

JACK HOLT, JR., Chief Justice. This appeal involves conversion of a checking account and savings account and wrongful dishonor of checks written on the checking account. Jurisdiction is pursuant to Ark. Sup. Ct. R. 29(1)(c).

In the fall of 1985, the appellant, City National Bank of Fort Smith (CNB) had two customers named Larry Goodwin, the appellee, Larry J. Goodwin, and Larry K. Goodwin. In November, 1985, two loans of Larry K. Goodwin were in default. On November 26, 1985, a collection officer, Jim Geels, initiated a process to take money from Larry K. Goodwin's deposit accounts and credit them to Larry K. Goodwin's loan. Before he withdrew

the funds, he pulled Larry K's loan file and checked the Social Security number on a document in the file. The Social Security number shown for Larry K. Goodwin was, in fact, Larry J. Goodwin's number. After checking this number in the computer, Geels took $3,229.07 from the joint checking and savings accounts of Larry J. Goodwin and his wife, Sandra Goodwin (Goodwins), instead of the accounts of Larry K. Goodwin.

On Saturday, November 30, Ms. Goodwin received written notice from CNB that four checks she had written between November 21 and 26, 1985, to four merchants (Harps, Vaughn Drug, Radiology Services, and the Colony Shop) had been returned for insufficient funds and that the Goodwins' joint checking account had a zero balance. Ms. Goodwin went to the central branch on the same day, and someone in the loan department informed her that there was no money in the Goodwins' checking account and that there was also a hold on their savings account.

After Ms. Goodwin told the employee that there should be funds in the accounts, she was referred to a loan officer, who told her that it appeared Jim Geels had taken the money to pay someone else's loan. Two unsuccessful attempts to contact Geels were made. Ms. Goodwin requested that certified letters of apology be sent and calls made to the merchants involved, and that her money be returned.

On Monday, December 2, she called three of the businesses to which she had written the checks. Apparently, none of them had received a call or letter. Later in the day, Ms. Goodwin met with Geels at the main bank; Geels told her that he had taken money from the wrong account and that letters would be sent to the persons who received the returned checks stating that the bank was at fault. On the same day, Geels redeposited the money into the accounts and informed her he had done so. Later that day, Geels dictated letters to the businesses that received the returned checks. He mailed the letters on the next day, December 3. No check written on the checking account subsequent to December 2, 1985, was dishonored.

On Thursday, December 5, the Goodwins received notice from CheckRite that the check written on November 21 to Vaughn Drug had been returned; notice from Radiology Services

that the check written on November 21 had been returned; notice from Harps that the check written on November 26 had been returned; a bank statement from CNB, dated November 29, postmarked December 3, showing a zero balance in both their checking and savings accounts; and copies of four letters from CNB to Harps, Vaughn Drug, Radiology Services, Colony Shop, each stating that the error was due to a mistake by the bank.

On December 16, the Goodwins received a bank statement dated December 11 reflecting a balance of $1,560.91 in their checking account and that a number of checks had cleared the account between December 2 and 11. The statement did not reflect the status of the savings account. About this time, the Goodwins received another notice from CheckRite that a check written on November 25 had been returned.

The Goodwins received a bank statement on January 10, 1986, reflecting money in the checking account, but again failing to contain anything concerning the savings account. On January 14, 1986, Ms. Goodwin closed both accounts and was paid the correct balances due.

Subsequently, CNB learned from a letter from the Goodwins' attorney that other checks written to merchants on November 12 and 21 had also bounced. CNB wrote a letter to one merchant and called the other, stating that it was the bank's fault that the checks were returned. The Goodwins did not notify the bank concerning any discrepancy or omission that occurred after December 2.

On February 6, 1986, the Goodwins filed suit against CNB based upon two causes of action. First they alleged that CNB willfully, maliciously, and intentionally, or in the alternative, acted with such reckless disregard of the consequences from which malice may be inferred, withdrew all the funds from their accounts and converted the funds to its own use. Secondly, they alleged that CNB wrongfully dishonored seven checks. For each cause of action, the Goodwins asked for $20,000.00 in compensatory damages and $144,706.06 in punitive damages.

At the close of the Goodwins' case, CNB moved for a directed verdict on the issue of punitive damages on both causes of action. The trial court denied the motion. The jury found for the

Goodwins and awarded compensatory damages of $10,000.00 and punitive damages of $30,000.00. The court entered judgment for $40,000.00, plus interest and costs. Thereafter, CNB moved for judgment notwithstanding the verdict, or in the alternative for a new trial, on the basis that there was insufficient evidence to support the verdict. The court denied the motion. From this order, CNB appeals.

CNB argues ten points for reversal. We reverse and remand on the ground that the trial court should have granted a directed verdict on the issue of punitive damages and, as a result, the trial court further erred in admitting into evidence two exhibits on the issue of punitive damages. Accordingly, we do not address CNB's other four contentions relating solely to punitive damages. However, it is necessary to consider three of the four remaining issues inasmuch as we remand to the trial court.

## I. PUNITIVE DAMAGES/ADMISSIBILITY OF EXHIBITS

CNB contends that the trial court erred in failing to direct a verdict on the issue of punitive damages and in admitting into evidence plaintiffs' Exhibit No. 69, a chart showing punitive damages, and Exhibit No. 71, a statement of CNB's financial condition on December 31, 1985, in that these exhibits were admissible only on the issue of punitive damages.

In considering the denial of a motion for directed verdict, this court views the evidence in a light most favorable to the party against whom the motion is sought and gives it its highest probative value, taking into account all reasonable inferences deducible from it. We affirm if there is substantial evidence to support the verdict. *James* v. *Bill C. Harris Construction Co.*, 297 Ark. 435, 763 S.W.2d 640 (1989).

This court has stated that conversion is "the exercise of dominion over property in violation of the rights of the owner or person entitled to possession." *Thomas* v. *Westbrook*, 206 Ark. 841, 177 S.W.2d 931 (1944). *See also McKenzie* v. *Tom Gibson Ford, Inc.*, 295 Ark. 326, 749 S.W.2d 653 (1988); *Ford Motor Credit* v. *Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979). Conversion can only result from conduct intended to affect property. W. Prosser, *Handbook of the Law of Torts* § 15 (5th ed.

1984). *See also First National Bank of Brinkley* v. *Frey*, 282 Ark. 339, 668 S.W.2d 533 (1984); *Restatement (Second) of Torts* § 222 A. (1965). The intent required is not conscious wrongdoing but rather an intent to exercise dominion or control over the goods that is in fact inconsistent with the plaintiff's rights. W. Prosser, *supra*.

■ Punitive damages are not recoverable in a conversion action simply because the defendant intentionally exercised control or dominion over the plaintiff's property. Simply put, the act of conversion in itself will not support an award of punitive damages. Instead, the plaintiff must show that the defendant intentionally exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages. *See Walt Bennett Ford, Inc.* v. *Keck*, 298 Ark. 424, 768 S.W.2d 28 (1989); *Herring, supra. See also McKenzie, supra.*

In *Walt Bennett Ford, supra*, a buyer purchased an automobile from Walt Bennett Ford. Mechanical and other defects immediately developed, and the buyer took it back to the dealer for repair on at least two occasions. On the first occasion, the dealer provided a substitute automobile for the buyer to use while his car was being repaired. On the second occasion, the buyer told the dealer that he would be out of the state for six to eight weeks and needed a "loaner" automobile to use while his car was being repaired. He testified that he was told that there would be no charge for the "loaner." On both occasions, the buyer signed a lease agreement form but testified that the form was blank when he signed it and that he was told that the form was only necessary to waive liability insurance on the substitute automobile.

When the buyer returned to pick up the car seven weeks later, the dealer demanded $1,200.00 in rent for the use of the substitute automobile. Upon the buyer's refusal to pay, the dealer reduced the rental to $360.00, calculated to cover the time that the dealer contended the car had been repaired and available to be picked up. The buyer testified that he had not received prior notice that the automobile was ready and refused to pay the reduced demand. Because of the buyer's refusal to pay rental, the dealer declined to surrender the car, and its service manager told the buyer that the dealer would keep the car until the buyer paid

the rental claimed. The buyer left the dealership on foot.

It was undisputed that all repairs to the car were warranty repairs, that the buyer owed nothing for the repairs, and that the lease agreement form for the substitute automobile did not grant the dealer a possessory lien on the automobile being repaired.

On appeal, the dealer contended that the trial court erred in submitting the issue of punitive damages to the jury and that the jury's award of punitive damages was unsupported by the evidence. This court disagreed, stating:

> Appellant's conduct of retaining the Yugo even through the trial, thirteen months after the demand for surrender, without any claim of mistake or privilege or other legal right to do so, presents a submissible issue on punitive damages. The jury reasonably could have concluded that appellant withheld Keck's property, his means of transportation, with the intent of causing him such inconvenience and damage that he would be coerced into payment of a questionable debt. Appellant continued his course of conduct even after it was sued for conversion, obtained legal counsel and filed a counterclaim for the disputed rental. The evidence is sufficient to support a finding of intent to cause damage.

There is no evidence in the case at bar that CNB converted the Goodwins' money for the purpose of violating their rights to the money or for the purpose of causing damages. The evidence simply shows that CNB, as a result of its confusion over the identities of Larry K. Goodwin and Larry J. Goodwin, intentionally exercised dominion over the wrong Goodwins' funds. After Ms. Goodwin informed CNB of its error and CNB verified what had occurred, CNB promptly redeposited the money into the Goodwins' checking and savings accounts. When Ms. Goodwin closed the accounts, CNB paid her the correct balances due. Granted, the bank statements sent to the Goodwins after CNB redeposited the money in both accounts did not reflect the status of the savings account; however, this evidence, standing alone, does not show an intent by CNB to violate the Goodwins' rights to their money or an intent to cause damages. Under the circumstances, we cannot say there is substantial evidence to support an award of punitive damages on the conversion cause of

action.

■ Likewise, we find that there is no substantial evidence to support an award of punitive damages on the wrongful dishonor cause of action. This court has indicated that punitive damages may be recoverable where a payor bank wrongfully dishonors a check written by its customer. *See Twin City Bank* v. *Isaacs*, 283 Ark. 127, 672 S.W.2d 651 (1984). However, only actual damages are recoverable where the dishonor occurs through a mistake. Ark. Code Ann. § 4-4-402 (1987).

■ This court has not defined the parameters of the concept, "mistaken dishonor." Other courts, interpreting provisions identical to Ark. Code Ann. § 4-4-402, have defined "mistaken dishonor" as wrongful dishonor done erroneously or unintentionally. *Yacht Club, Etc.* v. *First National Bank, Etc.*, 101 Idaho 852, 623 P.2d 464 (1980) (Interpreting Idaho Code § 28-4-402 (1980)). The word "mistake" is to be construed as limited to wrongful dishonor made in good faith. *Elizarraras* v. *Bank of El Paso*, 631 F.2d 366 (5th Cir. 1980) (Interpreting U.C.C. 4-402). Where a dishonor is caused by a set-off or charge made by a bank under an erroneous belief that it had a legal right to do so, the dishonor is not classified as mistaken but as willful or intentional. *Yacht Club, supra. See also* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 17-4 (2d ed. 1980).

■ There was simply no evidence presented that CNB acted in bad faith or that it deliberately or willfully dishonored the Goodwins' checks. In addition, the dishonor was not the result of a set-off caused by an erroneous belief by CNB that it had the legal right to do so. The record is devoid of evidence that CNB ever formed a belief as to its legal right to set-off the Goodwins' checking account. It simply confused the identities of Larry K. and Larry J. Goodwin and, as a result, set-off the checking account of Larry J. Goodwin and Sandra Goodwin instead of the accounts of Larry K. Goodwin. In sum, the dishonor of the Goodwins' checks occurred through a mistake. Accordingly, punitive damages were not recoverable.

■ Since the issue of punitive damages should not have been submitted to the jury, plaintiffs' Exhibit No. 69, the chart showing punitive damages calculated as one percent of CNB's

stockholders' equity, and Exhibit No. 71, the statement of CNB's financial condition, were not admissible. *See Life and Casualty Ins. Co. of Tenn.* v. *Padgett*, 241 Ark. 353, 407 S.W.2d 728 (1966). *See also KARK-TV* v. *Simon*, 280 Ark. 228, 656 S.W.2d 702 (1983).

In law cases, the issues of punitive and compensatory damages may be so interwoven that an error with respect to one requires a retrial of the whole case. *Id. See also Shepherd* v. *Looper*, 293 Ark. 29, 732 S.W.2d 150 (1987). This court has held that where the issue of punitive damages is erroneously submitted to the jury, together with the defendant's financial condition, an award of compensatory damages cannot stand. *Padgett, supra; KARK-TV, supra.*

Accordingly, we reverse and remand the entire case for further proceedings consistent with this opinion.

## II. ISSUES ON REMAND

### A. JURY INSTRUCTIONS ON CONVERSION

CNB contends that Instruction No. 6 on conversion given by the trial court was defective in that it failed to advise the jury that there must be a finding that CNB intended to exercise dominion over the Goodwins' accounts. CNB also contends that its proposed Instruction No. 6 correctly advised the jury on the law of conversion.

Instruction No. 6 given by the trial court stated that the Goodwins had the burden of proving three essential propositions to recover on their conversion cause of action:

(1) That they have sustained damages;

(2) That City National Bank took or exercised dominion over the checking and savings account in violation of the rights of the owners or the person entitled to possession; and

(3) That such taking or exercising of dominion over the checking and savings accounts was a proximate cause of Larry and Sandra Goodwin's damages.

Inasmuch as conversion can only result from

conduct intended to affect property, CNB is correct that Instruction No. 6 should have advised the jury that the Goodwins had the burden of proving that CNB intended to exercise dominion over their accounts. However, CNB's assertion that its proposed instruction properly stated the law on conversion is incorrect. Granted, the proposed instruction correctly informed the jury that the Goodwins had the burden of proving that CNB exercised dominion or control over their accounts in violation of their rights and intended to do so. Notwithstanding, the proposed instruction erroneously stated that the Goodwins had the burden of proving that they made demand for the return of their funds and that CNB refused to return the funds. Proof of demand and refusal is not necessary to support a conversion action. *Westark Production Credit Association* v. *Shouse*, 227 Ark. 1141, 305 S.W.2d 127 (1957); *Myers* v. *Myers*, 214 Ark. 273, 216 S.W.2d 54 (1948).

## B. INTERVENING CAUSE

CNB contends that the court erred in failing to give its offered Instruction A on intervening cause in that the Goodwins' own actions caused any damages they suffered. We disagree.

Offered Instruction A, modified AMI Civil 2d 503, stated:

If, following any act or omission of a party, an event intervened which in itself caused any damage, completely independent of the conduct of that party, then his act or omission was not a proximate cause of the damage.

The question of intervening cause is simply a question of whether the original act of negligence or an independent intervening cause is the proximate cause of an injury. *Hill Construction Co.* v. *Bragg*, 291 Ark. 382, 725 S.W.2d 538 (1987). The original act or omission is not eliminated as a proximate cause by an intervening cause unless the latter is in itself sufficient to stand as the cause of the injury. *Id.* The intervening cause must be such that the injury would not have been suffered except for the act, conduct, or effect of the intervening cause totally independent of the acts of omissions constituting the primary negligence. *Id.*

In light of our language in *Hill*, it is clear that the intervening cause is a negligence concept. It has no application to

intentional tort or wrongful dishonor cases such as the case before us. In short, the court was correct in refusing to give the instruction on intervening cause.

## C. TORT OF OUTRAGE

CNB contends that the trial court erred in failing to give its offered Instruction E, modified AMI Civil 3d 404, on the tort of outrage. Since there was no evidence presented at trial to warrant an instruction on outrage, this argument is meritless.

Reversed and remanded.

TURNER, J., not participating.