Ashel GORDON *v.* PLANTERS & MERCHANTS
BANKSHARES, INC., d/b/a Planters & Merchants Bank

95-1058                                               935 S.W.2d 544

Supreme Court of Arkansas
Opinion delivered December 23, 1996

1048

*Thomas D. Deen*, for appellant.

*Russell D. Berry*, and *Arnold, Grobmyer & Haley*, by: *Robert R. Ross*, for appellee.

ANDREE LAYTON ROAF, Justice. The appellant, Ashel Gordon, sued his bank, the appellee, Planters & Merchants Bancshares, Inc. ("Planters"), for wrongful charge-back of a check he deposited into his account. Gordon alleged that Planters violated Ark. Code Ann. § 4-4-213 (1987) and acted maliciously, intentionally, and in bad faith; he sued for the amount of the check, plus interest and punitive damages. This court reversed the trial court's previous dismissal of Gordon's action under Ark. R. Civ. P. 12(b)(6) in *Gordon v. Planters & Merchants Bancshares, Inc.*, 310 Ark. 11, 832 S.W.2d 492 (1992), and held that a collecting bank's right to charge-back an account terminates when settlement for a check becomes final. On remand, during a jury trial, the trial court granted a directed verdict to Planters on the issue of punitive damages, after which Planters conceded liability for compensatory damages for the wrongful charge-back. The trial court awarded Gordon the amount of the check, plus interest and $335 in attorney's fees. On appeal, Gordon contends that the trial court erred in granting Planters a directed verdict as to punitive damages and the amount of attorney's fees awarded. We agree that the trial court erred in directing a verdict on punitive damages and reverse and remand for a new trial.

Ashel Gordon and Lloyd Wallace were partners for approximately three years in a farming business known as "Gordon Wallace Farms." In 1982, the partnership ended when Wallace decided to take a job with Planters Bank. Pursuant to a dissolution agreement, Gordon paid Wallace $67,000 for what Gordon believed was the

right to all assets formerly belonging to the partnership.

In September, 1990, Gordon received a $2,494.21 check issued by Stuttgart Cooperative Buyers' Association ("Co-op"), drawn on the First National Bank of Stuttgart ("First National"), and made payable to Gordon Wallace Farms. The check was for patronage dividends which accrued during the operation of the partnership. Gordon endorsed the check "Gordon Wallace Farms" and deposited it on September 24, 1990, into his personal account at Planters where Wallace, Gordon's former partner, was working as a loan officer. The next day, First National made final settlement with Planters for the amount of the check, Planters completed the posting process, and credited Gordon's account for the amount of the check.

On September 26, just two days after the check was deposited, Wallace phoned the Gordon home and inquired whether Gordon Wallace Farms had received a check from the Co-op. It is not clear whether Wallace acquired knowledge of the check through his employment with Planters or through some other source. Gordon's wife told Wallace that the check had been received and deposited. When Wallace inquired whether he was entitled to one-half of the check, Mrs. Gordon instructed him to call back later and speak to Mr. Gordon; Wallace did not do so.

Instead, on September 27, Wallace called the Co-op to determine whether the check to Gordon Wallace Farms had been cleared. The Co-op officer manager called Wallace back at his office phone number at Planters and informed him that the check had been cleared. Wallace did not identify himself as an officer of the bank, or tell the Co-op manager that he was calling from his office phone.

Wallace then called Jack Barber, a friend of his who was a loan officer at First National. Wallace told Barber that Gordon Wallace Farms no longer existed, that he had been a member of the partnership, and that the check had been improperly endorsed. Barber passed this information on to the Co-op and to a customer service manager at First National. The First National service manager called the Co-op manager on two consecutive days, October 1 and October 2, obtained return of the canceled check from the Co-op after the second call, and returned it to Planters.

On October 3, a bookkeeper at Planters received from First

National the check which was marked "Return to Maker." The bookkeeper consulted Wallace, her supervisor, who instructed her to charge-back the check against Gordon's account. At Wallace's instruction, the bookkeeper charged-back the check and deducted the amount from Gordon's account.

Planters did not contact Gordon about the charge-back of the check, and Gordon was not aware of the debit to his account until he received a notice of overdraft approximately eight days after the check had been deposited at Planters. Gordon immediately went to Planters and spoke with Larry Bauer, the bank president. Bauer told Gordon that the charge-back was a personal matter between him and Wallace, and that Gordon would have to resolve the dispute with Wallace. Bauer did not investigate the matter or offer to assist Gordon in the resolution of the dispute.

Gordon brought suit against Planters alleging that the bank was strictly liable under Ark. Code Ann. § 4-4-213 (1987) (now codified as Ark. Code Ann. § 4-4-215 (Repl. 1991)) when it charged-back the check after final settlement. In addition, Gordon sued for punitive damages on the basis that Planters, through Wallace, acted maliciously and in bad faith. The trial court dismissed the action under Ark. R. Civ. P. 12(b)(6) for failure to state a claim on which relief could be granted.

Gordon appealed the dismissal to this court in *Gordon v. Planters & Merchants Bancshares, Inc.*, 310 Ark. 11, 832 S.W.2d 492 (1992) ("*Gordon I*"). In *Gordon I*, this court held that under Ark. Code Ann. § 4-4-213 (1987), a collecting bank's right to charge-back an account terminates when a settlement for the check becomes final. *Id.* Therefore, the facts, as alleged by Gordon, were sufficient to state a cause of action, and the case was remanded for trial. *Id.*

At trial, the judge granted Planters' motion for a directed verdict as to punitive damages. At that point, Planters conceded liability for compensatory damages for the wrongful charge-back. Accordingly, Gordon was granted a judgment of $2,494.21 in compensatory damages plus costs and interest, and $335 in attorney's fees. Planters was given credit for one-half of the amount of the check which represented the funds that Gordon had received in a settlement of his dispute with Wallace. On appeal, Gordon challenges the directed verdict on punitive damages and the amount of attorney's fees awarded.

### 1. Punitive damages.

Planters admitted that it wrongfully charged-back Gordon's account; thus, the only issue on appeal is whether Gordon has sufficiently pled and submitted evidence to support an award of punitive damages. In order to reverse the trial judge's ruling, this court must find that: 1) punitive damages are permissible under § 4-4-215(d); 2) there was sufficient evidence to allow the issue to be submitted to the jury; and 3) Planters Bank may be held vicariously liable for Wallace's wrongful actions.

#### A. Punitive Damages under § 4-4-215(d).

This issue of whether punitive damages are recoverable under the wrongful charge-back provision of the Uniform Commercial Code ("UCC"), Ark. Code Ann. § 4-4-215(d) (Repl. 1991), is an issue of first impression in Arkansas. We also have not found that other jurisdictions have considered this question. Therefore, it is necessary to review the general provisions in the UCC regarding the appropriate measure of damages, and cases in which we and other states have addressed the award of punitive damages under other UCC provisions. The introductory article to the UCC instructs that:

> The remedies provided by this subtitle shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither *consequential or special nor penal damages may be had except as specifically provided in this subtitle or by other rule of law.*

Ark. Code Ann. § 4-1-106(1) (Repl. 1991) (emphasis supplied). There are three different ways that courts have interpreted this language. William D. Hawkland, *UCC Series* § 1-106:04 (1982).

Some jurisdictions take a broad view of this section and find that it is permissible to impose consequential, special, or punitive damages unless they are specifically prohibited by a particular section of the Code. *Id.* Courts following this approach rely on the mandate at the beginning of the paragraph that remedies under the UCC are to be "liberally administered." *Id.*

Other courts take the opposite, or narrow approach, and hold that consequential, special, and punitive damages are allowable only when specifically authorized by the Code. *Id.* These jurisdictions

find that as a general principle of law courts should not go beyond the Code for answers to problems that are not specifically addressed therein. *Id.* Instead, "gaps in the Code are usually best filled through the use of analogy and extrapolation" rather than resort to common law. *Id.* However, the commentators note that this narrow approach appears "contrary to the plain meaning of subsection 1-106(1)" which specifically refers to "other rules of law." *Id.*

The third, and final approach is an intermediary or neutral interpretation of the section. *Id.* According to this view, Section 1-106 neither provides for nor prevents the imposition of special, consequential, or punitive damages. *Id.* Instead, the court must look to the common law to supplement the Code as provided in Section 1-103. *Id.* The commentators state that:

> This theory seems sound, because subsection 1-106(1) states quite plainly that it does not authorize the imposition of consequential, special or penal damages and that such damages are unavailable to the aggrieved party unless "specifically provided in this Act *or by other rule of law.*"

*Id.* (emphasis in the original).

■ Arkansas has not specifically adopted any of these three approaches. However, regardless of the approach, other jurisdictions have held that punitive damages are allowable under the UCC whenever a wrongdoer acts in a willful or malicious manner. *See, e.g., Fedders Corp. v. Boatright,* 493 So.2d 301 (Miss. 1986) (finding that punitive damages are allowable under the UCC when there is a breach of "gross magnitude"); *First Nat'l Bank v. Twombly,* 689 P.2d 1226 (Mont. 1984) (holding that punitive damages are recoverable under the UCC when "the Bank's conduct is sufficiently culpable").

■ As to damages under Article 4 of the UCC, the general provision on damages in this article declares:

> (a) The effect of the provisions of this chapter may be varied by agreement, but the parties to the agreement cannot disclaim *a bank's responsibility for its lack of good faith* or failure to exercise ordinary care *or limit the measure of damages for the lack* or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

(e) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. *If there is also bad faith, it includes any other damages the party suffered as a proximate consequence.*

Ark. Code Ann. § 4-4-103 (Repl. 1991) (emphasis added). From this provision, it is clear that Article 4 provides for the imposition of "other" damages when a bank acts in bad faith when dealing with its customers.

■ Moreover, we have recognized the imposition of punitive damages in wrongful dishonor cases which, like wrongful charge-back cases, are governed by Article 4 of the UCC. *City Nat'l Bank v. Goodwin*, 301 Ark. 182, 783 S.W.2d 335 (1990); *Twin City Bank v. Isaacs*, 283 Ark. 127, 672 S.W.2d 651 (1984).

When *Goodwin* and *Isaacs* were decided, the UCC provision on damages allowable for wrongful dishonor provided in part:

A payor bank is liable to its customers for damages proximately caused by the wrongful dishonor of an item. *When the dishonor occurs through mistake, liability is limited to actual damages* proved. If so proximately caused and proved damages may include damages for an arrest or prosection of the customer or *other consequential damages.*

Ark. Code Ann. § 4-4-402 (1987) (emphasis supplied). As with Ark. Code Ann. § 4-4-215, the wrongful dishonor provision was silent as to punitive damages. In addition, Section 4-402 specifically included limiting language as to the types of damages awardable, and only provided for actual and consequential damages.

In *Goodwin*, this court said that punitive damages were allowable when a bank dishonors a check based on an "erroneous belief that it had a legal right to do so" or in bad faith "deliberately or willfully dishonors a check," but that only actual damages were recoverable when the dishonor occurred through a mistake. *Goodwin, supra*. Although reference to dishonor through mistake was deleted from Section 402(b) in the revised uniform law in 1991, which Arkansas has adopted, *Goodwin* remains evidence of this court's rejection of the narrow approach in determining the amount of damages allowable under the UCC.

Furthermore, in *Citizen's Bank v. Chitty*, 285 Ark. 55, 684

S.W.2d 814 (1985), we addressed the question of damages in the context of a wrongful charge-back by a bank to its customer's account. Chitty's complaint alleged that his bank was negligent in the breach of a fiduciary duty owed to its depositor. *Id*. Although we held that Chitty was not entitled to consequential damages because there was not even an implication that the bank acted in bad faith, we stated:

> Ark. Stat. Ann. § 85-4-103(1) (Add. 1961) states that a bank may not disclaim its responsibility for "failure to exercise ordinary care or . . . limit the measure of damages for such lack or failure. . ." "The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, *and where there is bad faith it includes other damages, if any, suffered by the party as approximate consequence.*" Ark. Stat. Ann. 85-4-103(5). Thus it may be seen that the amount of recovery is limited to the amount of the item[s] *in the absence of bad faith.*

*Id*. (citing Ark. Stat. Ann. 85-4-103 which is now codified as Ark. Code Ann. § 4-4-103 (Repl. 1991)) (emphasis added).

■■    Because we have allowed the imposition of punitive damages when the pertinent wrongful dishonor provision did not specifically provide for them, it is clear that we have not adopted a narrow interpretation of Section 1-106. Moreover, in *Goodwin*, this court stated that punitive damages were recoverable under *both* the claim of wrongful dishonor and conversion, although we found no substantial evidence to support a punitive-damage award on either cause of action in that instance. *Goodwin, supra*. Consequently, this court has indicated that punitive damages can be awarded for Article 4 violations where the statute does not specifically prohibit them without the necessity that an alternative, common law tort be pled. Thus, Gordon's failure to assert a claim for conversion is not fatal to his claim for punitive damages.

■    There is a further reason that punitive damages should be allowed in this case. Arkansas Code Annotated § 4-1-203 (Repl. 1991) clearly provides that, "*Every* contract or *duty within this subtitle* imposes an obligation of good faith in its performance or enforcement." (Emphasis added.) As previously mentioned, Planters had a clear duty under Ark. Code Ann. § 4-4-215 to refrain from charg-

ing-back the check against Gordon's account once payment had become final. Planters' breach of this duty, under the circumstances presented by this case, could have been construed to be an exercise of bad faith which is strictly prohibited by Section 1-203. Moreover, Gordon sufficiently apprised the trial court of this issue when he alleged in his complaint that Planter's actions were "taken in bad faith," and that Planters "violated and exploited its fiduciary relationship" with him.

■ Although we have not specifically addressed whether punitive damages are recoverable for a breach of the duty of good faith under Section 1-203 of the UCC, in *Adams v. First State Bank*, 300 Ark. 235, 778 S.W.2d 611 (1989), we declared that the issue could have gone to the jury under a subjective test if the plaintiff had simply alleged sufficient facts to avoid summary judgment. Moreover, other jurisdictions have recognized that punitive damages are recoverable for a breach of the duty of good faith imposed by Section 1-203. *See, e.g., Twombly, supra* (finding that punitive damages are recoverable under the UCC when there is a breach of "gross magnitude"); *Commercial Cotton v. United Cal. Bank*, 209 Cal. Rptr. 551 (Cal. App. 4th Dist. 1981) (holding that punitive damages are recoverable where the bank breached the duty of good faith and fair dealing towards its depositor). Consequently, Planters' argument that punitive damages may not be allowed because Gordon's case is based in contract, as opposed to negligence or intentional tort, does not defeat Gordon's right to punitive damages pursuant to the duty of good faith imposed by Section 1-203 of the UCC.

*B. Substantial Evidence.*

■ In order to avoid a directed verdict and reach the jury on the issue of punitive damages, Gordon must have presented substantial evidence that the defendant acted "wantonly in causing the injury or with such conscious indifference to the consequences that malice may be inferred." *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992). We find that Gordon satisfied this burden, and thus the issue should have been submitted to the jury. *See Goodwin, supra.*

On September 26, Wallace notified Gordon that he thought he was entitled to half of the check made payable to "Gordon Wallace Farms" which Gordon had deposited into his personal bank account. Instead of pursuing the matter with Gordon or an attorney, Wallace abused his position at Planters Bank to have the

check charged-back against Gordon's account with Planters.

The testimony with regard to the handling of this check is pertinent to the resolution of the issue of punitive damages and it is accordingly summarized in detail. The Co-op manager, Virginia Woodward, testified that she did not dispute the check, that the Co-op did not have any problems with the endorsement, and that the check would not have been sent back "but for the intervention of whoever it was there at the bank in Stuttgart." Woodward was sufficiently concerned about this incident that she prepared a memo approximately one week after she returned the check. This memo recited the three phone calls she received from Wallace and Harr and the request from Harr to return the check because of a disputed endorsement.

Jack Barber, Gordon's friend at First National, testified that he did not determine that the negotiation of the check was unlawful, that he never saw the check, did not check the endorsement, and that he called the Co-op simply to relate information to his customer. Donna Harr, the manager at First National, testified that the reason for return which was stamped on the check was "other" and that "refer to maker" was also written on it at her direction. Harr could not explain why the endorsement box was not checked. She stated that the "customer [the Co-op] is the one that asked us to return the check, at our request." Harr further testified that she thought the Co-op asked that the check be returned "because of the endorsement," and that she made the decision that the endorsement was insufficient because the check was not signed by an authorized partner or party. She further stated that First National returned the check to Planters and the Co-op's account was credited with the funds.

Bonnie Wilbanks, the bookkeeper for Planters, testified that she discovered the returned check sitting in a basket by itself at the end of the work day on October 3. Wilbanks explained that the endorsement box was not checked, and that according to the bank's policy, "Gordon Wallace Farms" was a proper endorsement. When she inquired about the check, Wilbanks was instructed to speak with Wallace. According to Wilbanks, Wallace told her that there was a problem with the check and that it should be returned. Wilbanks further testified that Larry Bauer, the president of Planters, was in the room when she discussed the check with Wallace.

■ We think that there is substantial evidence that Wallace knew the effect of his actions and intentionally did them to achieve his personal ends. Thus, there is substantial evidence that it was Wallace's intentional and malicious purpose to have the check, in which he had a personal, pecuniary interest, charged-back against Gordon's account. At the very least, Wallace's behavior amounted to a conscious disregard for the consequences of his actions. Hence, we hold that there was sufficient evidence to present the issue of punitive damages to the jury.

### C. Agency Relationship.

Finally, to allow the jury to impose punitive damages on Planters, we must find that an agency relationship existed between Wallace and Planters when Wallace caused the check to be charged-back against Gordon's account.

■ Under the doctrine of *respondeat superior*, an employer may be held liable for punitive damages for the acts of his employee if the employee was acting within the scope of his or her employment at the time of the incident. *J.B. Hunt Transp., Inc. v. Doss*, 320 Ark. 660, 899 S.W.2d 464 (1995). Whether the employee's action is within the scope of the employment is not necessarily dependent upon the situs of the occurrence, but on whether the individual is carrying out the "object and purpose of the enterprise," as opposed to acting exclusively in his own interest. *Id.*

■ Planters asserts correctly that Wallace's personal, pecuniary interest motivated him to cause the charge-back of Gordon's check. However, Wallace utilized his position at the bank to achieve this purpose. Wallace further utilized his banking connections with Jack Barber of First National to start the charge-back procedure. Finally, Wallace was clearly acting within his supervisory capacity when he instructed Planters' bookkeeper to charge-back Gordon's check. Consequently, we find that Wallace was acting within the scope of his employment when he caused the charge-back of the account.

■ In addition, Planters may be held liable for punitive damages based on the conduct of Larry Bauer, the president of Planters. Specifically, Bauer refused to assist Gordon with the charge-back to his account, and instead, instructed Gordon to resolve the matter with Wallace. With this response, Bauer demonstrated his awareness of Wallace's actions, and more importantly, his

"conscious indifference" to the charge-back on Gordon's account. *See, Stein* v. *Lucas*, 308 Ark. 74, 823 S.W.2d 832 (1992). We find that Planters Bank may be held liable for punitive damages based on Wallace's and/or Bauer's conduct.

Furthermore, Bauer's behavior may be construed as a ratification of Wallace's conduct. In *Brady* v. *Bryant*, 319 Ark. 712, 894 S.W.2d 144 (1995), we said:

> [i]t is well settled in Arkansas law that when the principal has knowledge of the unauthorized acts of his agent, and remains silent...he cannot thereafter be heard to deny the agency but will be held to have ratified the unauthorized acts.... It has been said that the affirmance of an unauthorized transaction may be inferred from the failure to repudiate it, or from receipt or retention of benefits of the transaction with knowledge of the facts.

(citing *Arnold* v. *All American Assurance Co.*, 255 Ark. 275, 496 S.W.2d 861 (1973)). Although *Brady* involved an agent's unauthorized entrance into a settlement agreement on behalf of the principal, the principle of ratification also applies when the agent's actions are tortious, and ratification may bind the principal for punitive damages. Restatement (Second) of Agency §§ 217(c) & 218 (1957).

Because there was sufficient evidence to allow the jury to decide whether Gordon was entitled to punitive damages based on Wallace or Bauer's conduct, we reverse the directed verdict and remand for retrial.

### 2. Attorney's fees.

Because we reverse and remand this case for retrial, we do not reach the issue of the award of attorney's fees to Gordon. However, we note that in an affidavit submitted to the court Gordon claimed he was entitled to $11,248.95 in attorney's fees for eighty-seven billable hours at $120 an hour and $800 for depositions. The trial judge awarded Gordon's attorney only $335, which does not even cover the cost of the depositions in this case involving a difficult issue of first impression in Arkansas.

Reversed and remanded.

CORBIN, J., and Special Justices ROBERT S. SHAFER and K. LEANNE DANIEL dissent.

DUDLEY and BROWN, JJ., not participating.

DONALD L. CORBIN, Justice, dissenting. So much for the old adage that cheaters never prosper. After the majority's opinion today, it is apparent that not only do they prosper, but they may be entitled to punitive damages in addition to all the prosperity. There was no substantial evidence presented at trial to support an award of punitive damages to Appellant Ashel Gordon. To the contrary, there was evidence presented to the jury, including Gordon's own admissions, which demonstrated that Gordon was not entitled to the entire proceeds of the check and that this cause of action resulted only because Gordon's former partner, Wallace, happened to catch Gordon while he was attempting to keep the proceeds of the check all to himself. The trial judge said it best when he stated:

> [M]y conscience tells me that Mr. Gordon is trying to make—is already doubling his money on this deal. And to — to allow for him to shoot for punitive damages on top of that, after he has been frustrated in his attempt to possibly avoid his liability to Mr.—Mr. Wallace, that I can't in good conscience go with that.

The majority opinion mischaracterizes the trial testimony when it states that substantial evidence existed to present the issue of punitive damages to the jury. The majority is correct that both Gordon and his wife testified that it was their understanding that the partnership had been bought out by Gordon, and that, at the time, Wallace was not entitled to half of the money. The majority neglects to point out, however, that during the trial, on cross-examination, Gordon testified that ultimately he agreed that the check did not belong entirely to him. There was a further admission by Gordon that the Co-op had in the interim paid one-half of the proceeds of the check to him and the other half to Wallace. Thus, the trial judge was correct in his observation that Gordon had already gained all that he was rightfully entitled to when the Co-op paid him his share of the proceeds. The fact that he received the other half of the proceeds of the check when Planters moved for a directed verdict against itself demonstrates that Gordon had in fact gained twice the amount to which he was ever entitled.

The testimony elicited through Gordon's own witnesses does not support his contention that Wallace, and Planters as Wallace's employer, maliciously and intentionally caused damage to him.

Virginia Woodward, the Stuttgart Co-op bookkeeper, stated that Wallace called her on September 27, 1990, and asked her if the check to "Gordon Wallace Farms" had cleared the bank. She stated that she did not know, but she would call her bank and find out, and then call Wallace. When she found out the check had cleared, she called Wallace and told him. She stated that Wallace did not identify himself as a bank officer with Planters. She stated that she next heard from an employee of First National Bank, informing her that there was a dispute among the parties to the check, and that the Co-op could bring the check back to the bank for credit if the Co-op desired to do so. She stated that the bank employee told her it was up to the Co-op to do what it wished in the situation, since the check had already been paid. She stated that ultimately, she decided that it would be best to return the check to First National Bank for credit. She verified that she had no input from Wallace in her decision, and that Wallace said nothing that influenced her in any way.

Jack Barber, the loan officer at First National Bank, stated that he knew Wallace through some bank seminars and classes that they had attended together. He stated that he recalled being contacted by Wallace concerning the check. He stated that the purpose of Wallace's call was to inform him that a check had been deposited in Planters bank from the Stuttgart Co-op, payable to a farming partnership that had been dissolved for a couple of years. He stated that Wallace informed him that he (Wallace) had personal information that the entity was dissolved, because he had been involved in the partnership. He stated that Wallace did not ask him to do anything about the check, only that he wanted to inform Barber that a check had been written to a dissolved partnership so that Barber could inform its customer, the Co-op. Barber stated that to the best of his recollection, Wallace never called him about the check again.

Donna Harr, the bookkeeper at First National Bank, stated that she had been on vacation when the information initially came in about the check. She stated that when she returned, she was notified that the Co-op wanted to return the check because it questioned the propriety of the endorsement. She stated that it would have been her decision whether or not to return the check to Planters as unpaid. She further stated that in her opinion the endorsement was improper, because it lacked an individual signature by the person who signed "Gordon Wallace Farms" on the

back of the check, and because there was no indication from the endorsement whether the person signing the check was authorized to endorse such checks. She further stated that she had not heard the name of "Lloyd Earl Wallace" connected with the check, and that she did not even know who Wallace was.

Bonnie Wilbanks, the bookkeeper at Planters, stated that when she received the check, now marked "Refer to Maker," back from First National Bank, she asked Wallace, her supervisor, what to do with it. She stated that Wallace told her it was a return item, that it would have to be returned to the person who deposited it, and that there was a problem with it. She further stated that she knew that Wallace was the Wallace referred to in "Gordon Wallace Farms," but that she did not consider the situation as one in which Wallace had a personal interest in the proceeds of the check. She stated that when she asked Wallace what she should do with the check, Larry Bauer, the bank's president, was present in the room. She stated that it was normal practice that when the bank received a dishonored check it would be charged back to the customer's account.

Gordon testified that after his wife had discovered that their bank account was overdrawn due to the returned check from the Stuttgart Co-op, he went to the bank to talk to the president, Larry Bauer. Gordon stated that when he approached Bauer to ask him what happened, he was told by Bauer that he would have to check with Wallace, because the situation was between Gordon and Wallace. Gordon did, however, state that he received half of the funds due to him from the Co-op, and that the other half went to Wallace. It was at that point that Gordon acknowledged that he was not entitled to all of that money to the detriment of his former partner, Wallace.

None of the actions taken by Wallace, not to mention any actions which may have been attributable to Planters, demonstrate any malice or deliberate intent to harm or injure Gordon. Moreover, Gordon presented no testimony that he was in fact injured by the charge-back, other than the fact that he was out half the proceeds of the check, money which he was later paid by the Co-op. There was no testimony presented concerning the amount of money that Gordon's bank account was overdrawn due to the charge-back. In fact, during oral argument before this court, it was pointed out that none of the checks written by Gordon during that

interim period were returned to him for reasons of insufficient funds; Planters covered any amount that the account was overdrawn. In short, I can see no justification for actual damages, let alone punitive damages.

The evidence recited above demonstrates nothing more than that Wallace contested Gordon's actions in cashing a check made payable to the dissolved partnership and attempting to deprive Wallace of his share of the money. Wallace was attempting to defend his own interest in the proceeds of the check. Such defensive action hardly amounts to malicious, intentional, or willful desire to cause injury to Gordon. Gordon has already received a windfall from this cause of action to the tune of double his money. For this court to sanction his behavior by allowing him a chance to receive punitive damages, which he seeks in the amount of $150,000.00, is unconscionable.

For all of the above reasons, I respectfully dissent.

ROBERT S. SHAFER, Special Justice, dissenting. An action by a customer against a collecting bank pursuant to Ark. Code Ann. § 4-4-215(d), standing alone, should not support a claim for punitive damages as a matter of law. Even if punitive damages were recoverable in a case such as this, I would hold that the evidence is insufficient to submit the claim for punitive damages to the jury. Accordingly, I respectfully dissent from the Court's remand of the punitive damages claim for trial. I further would address the issue of attorney's fees and hold that the trial court abused its discretion under Ark. Code Ann. § 16-22-308 in awarding a fee of only $335 for the services of Gordon's attorney.

The Court held in *Gordon v. Planters & Merchants Bancshares, Inc.*, 310 Ark. 11, 14, 832 S.W.2d 492 (1992), that § 4-4-215(d) of the UCC provides a strict liability cause of action. Thus, if a customer of a collecting bank proves that the bank has received final settlement for an item, the bank is accountable for the full amount of the item, without regard to fault.

Under Arkansas law, a claim for punitive damages is a remedy, not an independent cause of action. It depends upon proof of an intentional tort, or in some cases, breach of contract coupled with tortious conduct, together with proof of malice or an intentional course of conduct for the purpose of causing harm. AMI Civil 3rd 2217. In short, there must be fault in regard to the underlying cause

of action (and not mere negligence, but intentional and willful conduct) and fault in regard to what the law calls "malice," or the evil disposition or purpose of causing harm to another. Since this case was tried solely on the basis of a strict liability cause of action, Gordon should not be permitted to pursue his claim for punitive damages.

Even assuming that § 4-4-215(d) has not displaced the common law with regard to the conduct in question, which is an issue the parties have not raised, no cause of action which may support a claim for punitive damages was pleaded in this case or argued in the first appeal. *See* Ark. Code Ann. § 4-1-103. There is no suggestion that an intentional tort cause of action was tried by consent of the parties and there was no request at trial to amend the pleadings to conform to such proof. Gordon alleged in his complaint that the bank's actions were malicious and taken in bad faith, but the mere allegation of malice does not state a cause of action, nor does every intentional act open the door to the imposition of punitive damages. *McClellan* v. *Brown*, 276 Ark. 28, 632 S.W.2d 406 (1982).

Gordon compares his statutory UCC claim to conversion, but the fact remains that he chose not to plead conversion. If he had done so, he would have been required to prove an ownership or possessory interest in the item in dispute, a check made payable to "Gordon Wallace Farms," not to Gordon individually, and that Wallace's conduct was in violation of Gordon's right. *Reed* v. *Hamilton*, 315 Ark. 56, 59, 864 S.W.2d 845 (1993); *Giroir* v. *MBank Dallas, N.A.*, 676 F.Supp. 915, 919 (E.D.Ark. 1987). Gordon was not required to offer such proof under § 4-4-215(d), because recovery under that provision lies in favor of any customer of the collecting bank. Assuming that Gordon could have presented a *prima facie* case of conversion, his proof on the claim would have been different than the record now before the Court.

Moreover, even proof of conversion would not automatically have entitled Gordon to submit a request for punitive damages to the jury. As the Court stated in *City National Bank* v. *Goodwin*, 301 Ark. 182, 188, 783 S.W.2d 335 (1990):

> Punitive damages are not recoverable in a conversion action simply because the defendant intentionally exercised control or dominion over the plaintiff's property. Simply put, the act of conversion in itself will not support an award of punitive

damages. Instead, the plaintiff must show that the defendant intentionally exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages.

The majority errs in excusing Gordon's failure to assert a claim for conversion, or some other intentional tort which might support a request for punitive damages, while permitting him to tack evidence of malice and bad faith onto his strict liability cause of action under § 4-4-215(d).

The majority recognizes that punitive damages are expressly *prohibited* in UCC cases "except as specifically provided in this subtitle or by other rule of law." Ark. Code Ann. § 4-1-106(1). In holding that § 4-4-215(d) may support an award of punitive damages, without requiring a plaintiff to plead and prove an independent tort, the majority has overlooked the force of the prohibition imposed by the legislature in § 4-1-106(1).

The majority looks elsewhere for specific authority for punitive damages, but without success. Ark. Code Ann. § 4-4-103, cited by the majority, refers to the possibility that a plaintiff may recover damages "suffered as a proximate consequence" of a defendant's breach of the UCC, when bad faith is also present. Since punitive damages are imposed to punish and to deter egregious conduct and not as a proximate consequence of a defendant's acts, § 4-4-103 is not a specific provision in the UCC for punitive damages and thus is inapplicable to § 4-1-106(1).

The majority cites *City National Bank* v. *Goodwin, supra,* in which the Court held that punitive damages were recoverable in a wrongful dishonor case against a payor bank pursuant to Ark. Code Ann. § 4-4-402, provided that the dishonor was willful and not merely "mistaken." At the time *Goodwin* was decided, § 4-4-402 limited a payor bank's liability for wrongful dishonor to actual damages "when the dishonor occurs through mistake." The *Goodwin* Court construed "mistake" as a "wrongful dishonor made in good faith," so that the limitation to actual damages applied only in such circumstances, and not when the dishonor was willful. In the case before it, the Court ruled that punitive damages were not recoverable because there was no evidence of a deliberate and willful dishonor by the defendant bank.

One year after *Goodwin,* the legislature amended § 4-4-402,

designating the then-existing statutory text as subparagraph (b) and deleting the words "when the dishonor occurs through mistake." The effect of this amendment was to make the limitation to actual damages in the statute *unconditional*. The majority recognizes that there is no longer any statutory basis in § 4-4-402(b) for the rule regarding punitive damages announced in *Goodwin*, but the majority states that *Goodwin* is still competent authority for rejecting a "narrow approach" to damages under the UCC. This construction of *Goodwin* accords too little deference to the legislature, which plainly intended by its amendment to eliminate the option of punitive damages in wrongful dishonor cases. The legislative response to *Goodwin* should guide the majority in holding that the option of punitive damages should not be read into § 4-4-215(d).

The majority relies upon the duty of good faith in Ark. Code Ann. § 4-1-203. However, the official comment to § 4-1-203 states that this section "does not support an independent cause of action for failure to perform or enforce in good faith." Furthermore, the UCC elsewhere implicitly limits damages for bad faith to damages "suffered as a proximate consequence" thereof, which does not include punitive damages. Ark. Code Ann. § 4-4-103(e).

The loss of *Goodwin* as competent authority for an award of punitive damages under chapter four of the UCC, together with the fact that Gordon did not plead an independent tort, indicates that the claim for punitive damages in this case is unsupported by the UCC or by any "other rule of law," as required by § 4-1-106(1).

But even if punitive damages were recoverable in law in a case such as this, the evidence presented by Gordon, viewed in the light most favorable to him, does not show any malice or conscious wrongdoing on the part of the bank's employee and agent, Wallace. Granted that Wallace acted intentionally, there is no proof that his purpose was other than to "roll back" the transaction so that the respective rights of the former partners in the check to "Gordon Wallace Farms" could be determined. After the charge-back, neither Gordon nor Wallace retained any of the proceeds of the check. Such damage to Gordon is hardly malicious. Wallace's conduct, while wrongful under the statute, is not the type of conduct that the civil law punishes with exemplary damages. *See McClellan v. Brown*, 276 Ark. at 31-32. Indeed, this case presents nothing more than a simple commercial dispute, which § 4-4-215(d) remedies by

making the collecting bank's duty and liability in these circumstances as straightforward and clear as possible. *See* Ark. Code Ann. § 4-1-102(2)(a).

Special Justice K. LeAnne Daniel joins this dissent.