Brian HUFFMAN and Brandy Huffman *v.*
LANDERS FORD NORTH, INC.

CA 07-157                                265 S.W.3d 783

Court of Appeals of Arkansas
Opinion delivered October 24, 2007

*Owings Law Firm*, by: *Steven A. Owings* and *Tammy B. Gattis*, for appellants.

*Watts, Donovan & Tilley, P.A.*, by: *David M. Donovan* and *Deborah S. Denton*, for appellee.

R OBERT J. GLADWIN, Judge. Appellants Brian Huffman and Brandy Huffman bring this appeal challenging the circuit court's granting a directed verdict on their claim for punitive damages in a conversion case, as well as the court's vesting title to the converted property in appellee Landers Ford North, Inc. Landers cross-appeals from the denial of a directed verdict on the Huffmans' conversion claim and on its counterclaim for breach of contract. We affirm on direct appeal and on cross-appeal.

On May 11, 2005, the Huffmans were interested in purchasing a new vehicle. They went to Landers's showroom to look at various vehicles and decided to test-drive a Ford Freestyle. After the test-drive and discussions with a Landers salesman, Brian Huffman signed a "Retail Buyer's Order Form" that contains the following provision labeled "Sales Conditions":

> In compliance with the Federal law pertaining to the truth in lending, I hereby authorize Landers to check my credit and employment history and submit application to any bank or finance company authorized to do business in Arkansas. *"Buyer's rights to possession of the vehicle described herein is contingent upon execution of a contract by Landers and Buyer and upon approval and acceptance of such contract by the providers of Buyer's financing."* APPLIES TO FINANCED PURCHASES ONLY!

(Emphasis in the original.) The "Retail Buyer's Order Form" also contained an integration clause, stating that it was the parties' entire agreement and superseded any prior agreement. Brandy Huffman also signed a power of attorney, authorizing Landers to sign any certificate of title or other supporting papers necessary to register or transfer title to their vehicle, a 1996 Taurus.

With Landers's approval, the Huffman's drove the Freestyle home and left their Taurus with Landers. The next day, Brandy Huffman was involved in an at-fault accident while driving the Freestyle. She reported the accident to Landers and was told by the general sales manager, John Roberts, that she had bought the Freestyle. Landers refused to return the Taurus to the Huffmans.

The Huffmans filed suit on May 25, 2005, alleging that the "Retail Buyer's Order Form" was not a binding contract and that Landers had converted their vehicle. They sought both compensatory and punitive damages. Landers answered, asserting that the "Retail Buyer's Order Form" was a binding contract and that the

Huffmans had signed all documentation necessary to transfer title of the Taurus to Landers. Landers also asserted a counterclaim for breach of contract, misrepresentation, and negligence.

The case was tried to a jury. The Huffmans had received pre-approved financing through their bank and were planning on using that source to finance their purchase. They asserted, however, that they did not inform Landers that they already had a check. According to the Huffmans, they were not prepared to purchase the vehicle that night because, among other things, they still had personal possessions in the Taurus and did not bring the title to the Taurus with them. When they did not get a chance to take a full test-drive because the Freestyle was almost out of fuel, salesman Vernon Allen had the Huffmans sign some paperwork so they could take the vehicle home overnight to determine if it met their needs. Included in this paperwork were the "Retail Buyer's Order Form" and the power of attorney. The Huffmans did not believe that they were entering into a contract to purchase the Freestyle because they had not yet determined if it met their needs. According to both of the Huffmans, this was a condition before they would agree to the purchase of the Freestyle.

The Huffmans testified that they made it clear to Allen that they were only interested in test-driving the Freestyle but that neither Allen, Landers's used-car sales manager Bobby Farrow, nor Landers's finance officer Patrick Elrod told them that Brian Huffman's signing the "Retail Buyer Order Form" meant that they had purchased the vehicle. The Huffmans also commented on the amount of paperwork they were signing for just an overnight test-drive. That night, after taking the Freestyle home, the Huffmans determined that the Freestyle would not meet their needs and that they did not like its layout. The next morning, Brandy Huffman called Landers to inform Landers that the vehicle did not meet their needs. While on her way to Landers's showroom, she was involved in the accident.

The day after the accident, the Huffmans went to Landers to obtain copies of the documents they had signed, and John Roberts again advised them that they had bought the Freestyle and needed to bring their bank draft to pay for the vehicle. They did not ask for the return of their Taurus at that time because they were still trying to determine whose insurance was going to pay for the damages to the Freestyle. When they did ask for their vehicle a few days later, Roberts ordered that it be blocked so that they could not remove it from Landers's lot.

Vernon Allen testified that the Huffmans told him that they wanted to buy the Freestyle but did not tell him that they wanted to test-drive it overnight. He could not recall which of the Huffmans told him they wanted to purchase the vehicle. Allen, John Roberts, and Patrick Elrod each described the transaction as a cash deal because it was not financed through Landers and that the "Retail Buyer's Order Form" supported this interpretation by showing a cash price for the Freestyle. Roberts testified that the "Retail Buyer's Order Form" would not have been filled out for an overnight test-drive because there were other forms for that purpose.

Roberts and Elrod said the "Sales Conditions" clause in the "Retail Buyer's Order Form" did not apply to the Huffmans because they were obtaining their own financing, while Allen opined that the clause did apply to the Huffmans. Both Elrod and Roberts stated that the "Retail Buyer's Order Form" obligated the Huffmans to purchase the Freestyle, contingent upon approval of their financing. They also stated that the power of attorney authorized Landers to take title to the Taurus.

At the close of the Huffmans' case, Landers moved for a directed verdict on all of the Huffmans' claims on the basis of the reasons in their motion in limine and their motion for summary judgment. At the close of all of the evidence, Landers renewed its prior motion for directed verdict on the Huffmans' claims, as well as their own counterclaim for breach of contract. The Huffmans also moved for a directed verdict on Landers's breach-of-contract claim. The circuit court granted the motion with respect to the Huffmans' punitive damages claim, but otherwise denied the motions.

The circuit court submitted the case to the jury on a series of interrogatories. The first interrogatory asked whether the Huffmans breached a contract to purchase the Freestyle and trade in the Taurus. The jury answered in the negative. The second interrogatory asked whether Landers committed an act of conversion over the Taurus. The jury answered in the affirmative and assessed damages at $6500. The third interrogatory asked whether Brandy Huffman was negligent in her operation of the Freestyle and, if so, whether that negligence was the proximate cause of the damage to the Freestyle. Nine members of the jury answered in the affirmative and assessed damages in the amount of $12,240. The circuit court entered a net judgment against the Huffmans in the amount of $5740. The circuit court also found that Landers was the owner

and entitled to possession of both the Taurus and the Freestyle. The Huffmans filed a timely notice of appeal, and Landers cross-appealed.

The Huffmans first argue that the circuit court erred when it granted Landers's motion for a directed verdict on their punitive-damages claim. In reviewing an order granting a motion for directed verdict, the appellate court views the evidence in the light most favorable to the party against whom the verdict was directed; if any substantial evidence exists that tends to establish an issue in favor of that party, then a jury question is presented, and the directed verdict should be reversed. *Trotter v. Bowden*, 81 Ark. App. 259, 101 S.W.3d 264 (2003).

The Huffmans rely on the supreme court's decision in *Walt Bennett Ford, Inc. v. Keck*, 298 Ark. 424, 768 S.W.2d 28 (1989), in support of their argument that the trial court should have submitted the issue of punitive damages to the jury. However, the more relevant precedent is *City National Bank v. Goodwin*, 301 Ark. 182, 783 S.W.2d 335 (1990). In that case, the bank had one customer named Larry K. Goodwin and another named Larry J. Goodwin. Larry K. Goodwin had two loans in default, and the bank decided to exercise its right to setoff the funds in his account against the overdue loans. However, the bank inadvertently took the money from Larry J. Goodwin's account. Mrs. Larry J. Goodwin then received notice that four checks had been returned for insufficient funds. Mrs. Goodwin requested that the bank call the merchants that had been affected and explain the situation, as well as apologize to her. The bank ultimately took these actions, but several checks were still returned for insufficient funds. The Goodwins sued the bank for wrongful dishonor and wrongful conversion of their checking and savings accounts. The trial court awarded the Goodwins $10,000 in compensatory damages and $40,000 in punitive damages.

On appeal, the supreme court held that the trial court should have granted the bank's motion for a directed verdict on the issue of punitive damages. The court held that:

> Punitive damages are not recoverable in a conversion action simply because the defendant intentionally exercised control or dominion over the plaintiff's property. Simply put, the act of conversion in itself will not support an award of punitive damages. Instead, the plaintiff must show that the defendant intentionally

exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages.

301 Ark. at 188, 783 S.W.2d at 338. The supreme court then went on to distinguish the facts in that case from those in *Keck*. Here, although Landers exercised dominion and control over the Taurus, it did so under a claim of right based on its belief that there was a valid contract and the power of attorney. The Huffmans do not point to any evidence tending to show that Landers was intending to violate their rights or cause them damage. Therefore, the circuit court correctly directed a verdict on the punitive damages claim.

■ The Huffmans next argue that the circuit court erred in awarding title of the Taurus to Landers. They do not cite any cases on the issue of whether a judgment in a conversion case vests title in the defendant. However, two early Arkansas cases appear to follow the majority rule that the recovery of a judgment for conversion and satisfaction thereof would have, as a matter of law, vested the title to the converted property in the defendant. *Meyer Bros. Drug Co. v. Davis*, 68 Ark. 112, 56 S.W. 788 (1900); *Dow v. King*, 52 Ark. 282, 12 S.W. 577 (1889). We cannot find that the issue has been raised in Arkansas since *Meyer Brothers* was decided. The reason behind the rule is that a successful conversion action amounts to a forced sale. *See* RESTATEMENT (SECOND) OF TORTS § 222A, Comment c (1965). This is because a conversion action seeks recovery for the value of the converted property, as opposed to a replevin action that seeks recovery of the property itself. *JCBC, LLC v. Rollstock, Inc.*, 22 S.W.3d 197, 203 (Mo. App. 2000); *see also France v. Nelson*, 292 Ark. 219, 729 S.W.2d 161 (1987) (distinguishing between the two causes of action). It is therefore proper for a judgment to provide that, upon satisfaction of the judgment, title of the converted property shall pass to the defendant. *See Fox v. Am. Propane, Inc.*, 508 S.W.2d 426, 429 (Tex. Civ. App. 1974). The judgment in the present case awarded Landers title and possession of the vehicle immediately. This was proper because the judgment for the conversion in the Huffmans' favor had been satisfied by being set off against the judgment in favor of Landers for negligence in damaging the Freestyle.

As its first point on cross-appeal, Landers argues that the circuit court erred in not directing a verdict in its favor on the breach-of-contract claim. We review the denial of a motion for

directed verdict to determine if the jury verdict is supported by substantial evidence. *D'Arbonne Constr. Co., Inc. v. Foster*, 354 Ark. 304, 123 S.W.3d 894 (2003).

■ The jury was not asked specifically to determine whether the parties had a valid contract. From the jury's answer to the first interrogatory, we cannot tell whether the jury found that there was no valid contract or whether there was no breach by the Huffmans. However, when we look at the answers to the first and second interrogatories together, it becomes clear that the jury found that there was no contract. Landers argues that the "Retail Buyer's Order Form" was a complete contract and, citing *Walt Bennett Ford, Inc. v. Dyer*, 4 Ark. App. 354, 631 S.W.2d 312 (1982), further argues that parol evidence cannot be introduced to vary the terms of an integrated contract. However, Landers's argument presupposes the validity of a contract and whether a contract exists or not is for the trier of fact to determine. *Clark v. Ridgeway*, 323 Ark. 378, 914 S.W.2d 745 (1996). Landers does not argue that the jury's verdict on this point is not supported by substantial evidence. The parol-evidence rule has no application where there is a question of whether the parties entered into a contract in the first instance. *Farmers Co-op Ass'n Inc. v. Garrison*, 248 Ark. 948, 454 S.W.2d 644 (1970). Further, Landers had the burden of proof on this issue, and it is rare to direct a verdict in favor of the party with the burden of proof. *McGrath v. Carson*, 79 Ark. App. 269, 86 S.W.3d 415 (2002).

■ Landers next argues that the circuit court erred in denying its motion for a directed verdict on the Huffmans' conversion claim because the power of attorney allowed it to sign documents regarding the Taurus. Again, this argument assumes the existence of a valid contract, and the efficacy of the power of attorney depends upon the validity of the contract for the sale of the Freestyle because, without that contract, the Huffmans would not need to give Landers a power of attorney to transfer title to the Taurus.

Affirmed.

Pittman, C.J., and Robbins, J., agree.