Randy PORTER *v.* David HARSHFIELD, Jr., M.D.

96–940                                                                 948 S.W.2d 83

Supreme Court of Arkansas
Opinion delivered June 23, 1997

*Gary Eubanks & Associates*, by: *James Gerard Schulze*, for appellant.

*Michael Angel*, for appellee.

W.H."Dub" Arnold, Chief Justice. The appellant, Randy Porter, brought suit against appellee David L. Harshfield, Jr.,

M.D., d/b/a Riverside Radiology Group, to recover damages for injuries sustained when Dr. Harshfield's employee, Jerry Pearrow, a radiology technician, sexually assaulted Porter while conducting a gallbladder ultrasound. Porter's separate suit against Pearrow resulted in a default judgment and a subsequent award to Porter in the amounts of $15,000 in compensatory damages and $15,000 in punitive damages. In the present appeal, Porter challenges the trial court's granting of summary judgment in Dr. Harshfield's favor. We affirm.

The facts as set out in Porter's complaint are as follows. On October 4, 1993, Porter went to Riverside Radiology Group in North Little Rock for an ultrasound for suspected gallbladder problems. Pearrow escorted him to an examining room and requested that he partially disrobe, don a hospital gown, and lie on his back on the examining table. Pearrow put gel on Porter's stomach and proceeded to examine his side several times. He then unbuckled and unzipped Porter's pants, pulled them down, and examined around his testicles. Feeling something on his penis, Porter looked down to find Pearrow performing oral sex on him. Porter immediately got off the table, put on his clothes, and left the clinic.

In his complaint, Porter claimed that Pearrow's actions were within the course and scope of his employment and thus should be imputed to Dr. Harshfield. In his answer, Dr. Harshfield admitted that Porter had been referred to his clinic on the date in question, but denied any knowledge of the sexual assault. He pleaded affirmatively that, if Pearrow indeed committed the actions alleged, his actions were outside the scope of his employment.

Both parties filed motions for summary judgment. Attached to Dr. Harshfield's motion was the affidavit of Dr. Joseph Calhoun, the supervising radiologist at the clinic while Dr. Harshfield was the acting Chief of Radiology at the Veterans Administration Hospital. Dr. Calhoun averred that he had been practicing radiology in Little Rock since 1950. "Eminently familiar" with the standard of care in this area, Dr. Calhoun explained that it was standard procedure to allow radiology technicians to perform

ultrasound tests unsupervised unless the examination was of an unusual nature. A routine gallbladder exam, according to Dr. Calhoun, was not of an unusual nature.

Dr. Harshfield also presented his own affidavit in which he stated that, at the time of the incident, he had no knowledge that Pearrow had the intent to touch or physically contact Porter in an inappropriate way, nor did he possess knowledge of any facts that would have alerted him to the probability that Pearrow would engage in such behavior. He further averred that Pearrow's actions were wholly outside his employment and beyond the duties and responsibilities of a radiology technician at the clinic. According to Dr. Harshfield, Pearrow's actions did not benefit him and were unexpectable.

In response to Dr. Harshfield's motion, Porter claimed that Dr. Harshfield had conducted virtually no background check on Pearrow. He further complained that Dr. Harshfield failed to supervise Pearrow; instead, he allowed Pearrow to "be his own boss." Porter also filed a motion for summary judgment, claiming that Dr. Harshfield had knowledge of Pearrow's past misconduct. In support of this contention, Porter submitted the affidavit of Little Rock Police Officer Sam Morshedi, who averred that he interviewed Pearrow on October 6, 1993, at which time Pearrow told him that he had previously engaged in homosexual conduct and had had a prior complaint filed against him at the clinic for sexually assaulting a female during a breast examination. After considering the pleadings, affidavits, discovery, and arguments of counsel, the trial court granted summary judgment in Dr. Harshfield's favor.

■ We have recently summarized our standards for summary judgment review in *O'Mara v. Dykema*, 328 Ark. 310, 315-316, 942 S.W.2d 854 (1997):

> The standard of review for a grant of summary judgment is familiar. Summary judgment should only be granted when it is clear that there are no disputed issues of material fact. *Franklin v. Osca, Inc.*, 308 Ark. 409, 825 S.W.2d 812 (1992). It is appropriate to sustain a grant of summary judgment if the evidence brought before the trial court by the moving party shows "that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tullock v. Eck*, 311 Ark. 564, 567, 845 S.W.2d 517, 519 (1993); Ark. R. Civ. P. 56(c).

Appellees, as movants for summary judgment, bear the burden of showing that there is no issue of material fact. *Gleghorn v. Ford Motor Credit Co.*, 293 Ark. 289, 737 S.W.2d 451 (1987). All evidence must be viewed in the light most favorable to appellants, as they are the parties resisting the motion; and they are also entitled to have all doubts and inferences resolved in their favor. *National Bank of Commerce v. Quirk*, 323 Ark. 769, 918 S.W.2d 138 (1996). However, they may not rest upon the mere allegation of their pleadings; Ark. R. Civ. P. 56 requires their response, by affidavits or other evidence, to specifically show that there is a genuinely disputed issue of material fact. *Guthrie v. Kemp*, 303 Ark. 74, 793 S.W.2d 782 (1990). Once a movant makes a prima facie case for summary judgment, the respondent must then meet proof with proof by showing that there remains a genuine issue of material fact. *Mt. Olive Water Ass'n v. City of Fayetteville*, 313 Ark. 606, 856 S.W.2d 864 (1993).

Even if there are disputed facts, if reasonable minds would not differ as to the conclusion to be reached, then a grant of summary judgment is proper. *Chalmers v. Toyota Motor Sales*, 326 Ark. 895, 935 S.W.2d 258 (1996). Further, if a respondent to a motion for summary judgment cannot present proof on an essential element of the claim, the movant is entitled to summary judgment as a matter of law. *Short v. Little Rock Dodge, Inc.*, 297 Ark. 104, 759 S.W.2d 553 (1988).

In asking us to reverse the trial court's granting of summary judgment, Porter suggests that we analyze his case under at least three different theories discussed in a recent law review article. *See* Jorgensen, *Transference of Liability: Employer Liability for Sexual Misconduct by Therapists*, 60 BROOK. LAW REV. 1421 (1995). First, he asks that we apply the common-carrier theory of recovery to his case. According to Porter, as a patient, he was in a position at least as vulnerable as a passenger of a common carrier, and that, accordingly, Dr. Harshfield had a duty to protect him from willful assaults by his employee. Under this theory, which emerged from railroad-passenger cases, liability is based on the exclusive control that the carrier has over the passenger. *Id.* at 1449. It calls for an extraordinary, nondelegable duty of care that imposes liability on the employer for any harm befalling the plaintiff. *Id.* at 1450. In a common-carrier analysis, the plain-

tiff is never obligated to prove that the employee was acting under the scope of his or her employment or even that the actor was the defendant's employee. *Id.; see also Stropes v. Heritage House Children's Ctr.*, 547 N.E.2d 244 (Ind. 1989).

Another theory of liability propounded by Porter is one of "job-created power." Under this theory, employers are held vicariously liable for an employee's intentional torts. Jorgensen, 60 Brook. L. Rev. at 1435. Porter claims that, by giving Pearrow supervisory authority, Dr. Harshfield granted job-created power to Pearrow, who in turn abused this power when he sexually assaulted Porter while performing the ultrasound. Porter further suggests that "the scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks." *Id.* at 1437; *quoting Samuels v. Southern Baptist Hospital*, 594 So.2d 571 (La. App. 1992), *cert. denied* 599 So.2d 316 (La. 1992). However, courts have been generally reluctant to extend this theory of vicarious liability too far beyond the realm of police officers or those with special duties and powers associated with their positions. *Id.* at 1439.

Porter also asks us to examine his case on the basis of what was "reasonably incidental" to Pearrow's legitimate work activities. *See Stropes v. Heritage House Children's Ctr., supra;* and *Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344 (Alaska 1990). He asserts that Pearrow's actions, while not desired or authorized by Dr. Harshfield, were reasonably incidental to Pearrow's job as a radiology technician.

■ Rather than analyze the present case under one of the aforementioned theories from other jurisdictions, we think that the better course is to adhere to the theory of master–servant liability that we have followed since 1910. *See Sweeden v. Atkinson Imp. Co.*, 93 Ark. 397, 125 S.W. 439 (1910)(an act of an employee, in order to render the employer liable, must pertain to something that is incident to the employee's duties and which it is his duty to perform or for the benefit of the employer). Our test

was further explained in *Life & Cas. Ins. Co. of Tenn. v. Padgett*, 241 Ark. 353, 355, 407 S.W.2d 728 (1966):

> We think the law as it stands today is fairly summarized in the Restatement of Torts, where it is said that the master is subject to liability for his servant's intentional tort "if the act was not unexpectable in view of the duties of the servant." Restatement, Torts (2d), 245 (1958).

More recently, we reviewed our test, commonly referred to as the respondeat superior doctrine, in *Gordon v. Planters & Merchants Bankshares*, 326 Ark. 1046, 935 S.W.2d 544 (1996). There, we said that an employer may be held liable for punitive damages for the acts of his employee if the employee was acting within the scope of his or her employment at the time of the incident. *Id.*; *J.B. Hunt Transp., Inc. v. Doss*, 320 Ark. 660, 899 S.W.2d 464 (1995). Whether the employee's action is within the scope of the employment depends on whether the individual is carrying out the "object and purpose of the enterprise," as opposed to acting exclusively in his own interest. *Id.*

■ Applying these principles to the facts before us, we must agree with the trial court that Pearrow's sexual assault of Porter was unexpectable. Pearrow was not, by any stretch of the imagination, acting within the scope of his duties as a radiology technician when he assaulted Porter. Rather, Pearrow's actions were purely personal. Because Pearrow's actions were not expectable in view of his duties as a radiology technician, we conclude that Dr. Harshfield may not be held liable for Pearrow's actions and was thus entitled to summary judgment as a matter of law. *See Life & Cas. Ins. Co. of Tenn. v. Padgett*, 241 Ark. 353, 407 S.W.2d 728 (1966).

■ Dr. Harshfield contends that Porter's remaining claims for negligent hiring, retention, and supervision are procedurally barred because he failed to amend his complaint to include these theories of recovery. While it is true that Porter did not present these claims in his complaint, Dr. Harshfield acknowledged in his brief in support of his motion for summary judgment that Porter had raised three theories of recovery: negligent hiring and retention; negligent supervision; and respondeat superior. Under these

circumstances, we must conclude that the negligence claims were tried by the express or implied consent of the parties and thus should be treated in all respects as if they had been raised in Porter's complaint. *See* Ark. R. Civ. P. 15(b).

Turning to the merits of Porter's negligent-hiring claim, Dr. Harshfield contends that our decision in *St. Paul Fire & Marine Ins. Co. v. Knight*, 297 Ark. 555, 764 S.W.2d 601 (1989) is dispositive. We agree. In that case, a patient argued that the hospital's background check on an employee who sexually molested him was very inadequate and that a proper investigation would have shown that he was not qualified for the position of psychiatric technician. The investigation conducted by the hospital revealed that the technician had received apprentice counselor's credentials, supervised a summer playground staff, completed a work-study program, and received an honorable discharge from the Air Force. *Id.* He had no criminal record and no history of violent acts or sexual misconduct. *Id.* On appeal, we concluded that there was no evidence that the hospital gained any information that would have led them to conclude that the employee might be predisposed to commit violent acts against anyone. *Id.*, *citing Williams v. Feather Sound, Inc.*, 386 So.2d 1238 (Fla. App. 1980). We further surmised that "[i]t would take a vivid imagination to glean from this evidence any predisposition of appellant to molest adolescent males or commit sexual assault." *Id.*; *citing Strauss v. Hotel Continental Co., Inc.*, 610 S.W.2d 109 (Mo. App. 1980).

In the present case, Dr. Harshfield stated in his deposition that Pearrow had the highest ultrasound degree available. He had known Pearrow for some eight years while the two worked together at Arkansas Children's Hospital before he hired him as a technician and described him as very dependable. Porter claims that Dr. Harshfield should have inquired as to why Pearrow left Arkansas Children's Hospital; however, he has not abstracted any evidence or testimony to show what, if anything, Dr. Harshfield would have discovered had he conducted a background check that would have led him to believe that Pearrow was predisposed to commit sexual assault. Porter further points to Dr. Harshfield's testimony in his deposition that Pearrow had described himself as "asexual." Yet Porter has stated no connection, and we know of

none, between sexual orientation and a predisposition to commit sexual assault.

Regarding the negligent-retention claim, Porter refers to Pearrow's statement to Officer Morshedi, made after the incident in question, that he had engaged in prior homosexual misconduct and had had a prior sexual-assault complaint against him stemming from a breast examination that he had conducted while employed at Dr. Harshfield's clinic. Again, the fact that Pearrow had engaged in homosexual conduct in no way indicates that he would commit a sexual assault. As to the prior complaint, Dr. Harshfield claimed that he was unaware that such a complaint existed. Officer Morshedi's affidavit did not address whether a complaint was made before the incident in question, much less whether Dr. Harshfield knew that such a complaint existed or whether the complaint had any validity. As such, Porter failed to meet proof with proof on this issue.

In support of his negligent supervision claim, Porter points to Dr. Harshfield's policy at the clinic of having a female employee in the room when a male employee examines a disrobed female patient. He claims that Dr. Harshfield should have had a similar policy in place for Pearrow since he was aware that Pearrow had described himself as asexual. However, he offers no convincing authority or argument in support of his contention. We do not consider assignments of error that are unsupported by convincing legal authority or argument. *Berry v. St. Paul Fire & Marine Ins. Co.*, 328 Ark. 553, 944 S.W.2d 838 (1997).

Finally, Porter asserts that public-policy considerations mandate reversal of the granting of summary judgment in his case. Particularly, he claims that Dr. Harshfield, who made a profit from his clinic while being employed by the VA Hospital, received an economic benefit by allowing Pearrow to be his own boss. Thus, according to Porter, Dr. Harshfield must bear the risks that go along with the economic benefit. In our view, the connection between Pearrow's authority as a radiology technician and the abuse of that authority to indulge in personal, sexual misconduct is simply too attenuated to include within those risks allocated to his

employer. Based on the foregoing, we affirm the decision of the trial court.

Affirmed.

CORBIN, J., dissents.

DONALD L. CORBIN, Justice, dissenting. The Appellant raises four possible theories that this court could utilize in order to place liability on the health-care provider — the ultimate person upon which blame should lie. I address only two of them, as the other two were not adequately developed by Appellant. I would be willing, however, to consider the remaining two theories in the future, in the event they are properly developed for appeal.

I would apply the common-carrier liability theory to allow recovery in this case. True enough, that theory originated with companies that were in the business of transporting passengers, but I believe the reasons behind this theory could be applied to the situation presented in this case. The basis of the theory, as it relates to common carriers in Arkansas, is a recognition of an enhanced liability to passengers because they are most vulnerable due to the fact that they have entrusted the common carrier with their lives. Under this doctrine, common carriers are responsible for the intentional torts of their employees. The policy reason that militates such a high standard of care is the vulnerability of the patron.

I would extend this high standard of care to medical-care providers. I can think of no greater responsibility than the duty owed by medical-care providers to safely exercise their skills and maintain control and supervision over their support staff upon accepting a patient into their care. A patient entrusts his body to the physician and necessarily to any of the physician's support staff. The patient subjects himself to a loss of dignity by even divulging his personal thoughts as to what ails him. Who does not feel the most vulnerable when told to disrobe and put on one of those split-tail gowns? Nakedness makes one feel the weakest, the most vulnerable. In addition to these feelings of vulnerability, we are conditioned since childhood to do what the doctor or his staff say "if we want to get well." Do we refuse to follow or question the

control of physicians or their staffs? No. We blindly obey their orders. Upon their direction, we bend over, we make a fist, we turn this way or that, we take a deep breath, and we even cough on command. We are essentially like sheep being led to slaughter, blindly doing as we are told. The reason for this blind faith lies within the trust we have for all medical-care providers, whom we are told will help us in our time of need.

I do not think it is proper for the medical-care provider, the authoritative figurehead, to be let off the hook of accountability because his employee's assault on his patient did not pertain to something that is incident to the employee's duties — that it was not foreseeable in view of the duties of the servant pursuant to our doctrine of respondeat superior. This is where I believe the majority is wrong. Certainly, the record reflects that Dr. Harshfield is a decent and fine physician, who employed Pearrow on the basis of his skills and reputation in the health-care field. The record further reflects that Dr. Harshfield did not in any manner desire or authorize Pearrow to make the sexual assault on his patient. But in this situation, control, trust, and vulnerability are the buzz words. This physician, acting through his radiology technician, Pearrow, to whom he had delegated the responsibility of solely caring for his patient, must and should bear the ultimate responsibility for the outrageous harm done to his patient, the Appellant herein. The majority's decision is very disturbing to me. After reading this decision, who will ever totally trust any health-care provider? If it happened once, it can do so again.

What makes the majority's decision even more disturbing is the fact that it is common practice that a male medical-care provider have a female medical-care provider present when he is examining a female patient. Although I suspect that the concern for the female patient is merely secondary to the male medical-care provider's desire to protect himself from unwarranted accusations arising from such intimate encounters, this decision has the potential of undermining such practice. Because if such acts by the employer are not foreseeable under the instant facts, then there is no need to continue this practice. It has a smack of gender bias. The bottom line is that if it is foreseeable that a one-on-one encounter between a male medical-care provider and a female

patient could lead to improper sexual assaults being perpetrated on a female patient, then it is just as foreseeable that such assaults may be perpetrated on a male patient. The key to viewing such a situation lies not within a heterosexual-versus-homosexual attraction; rather, the situation turns on the fact that the vulnerable patient finds himself or herself alone with a stranger while the patient is in a submissive situation. In fact, I agree with the majority's observation that there is no connection between a person's sexual orientation and a predisposition to commit sexual assault. Thus, I can discern no valid reason for having a third party present in the examining room when the medical-care provider is male and the patient is female, all the while continuing to allow a male medical-care provider to be alone with a male patient.

My observations would just as easily support liability under the theory of job-created power. Under this theory, employers are held vicariously liable for an employee's intentional torts. Because Dr. Harshfield gave Pearrow supervisory control over his patient, he gave job-created power to Pearrow. The scope of risks attributable to a health-care provider should increase with the amount of authority and freedom of action granted to a servant in performing his assigned tasks. This is particularly true when those supervisory duties include one-on-one encounters with patients.

Based upon the foregoing reasons, I respectfully dissent.