Gordon COSTNER *v.* Beatrice ADAMS, Individually and as
Administratrix of the Estate of James Adams, Sr., *Deceased*,
and Tommy Adams, Individually

CA 02-721 121 S.W.3d 164

Court of Appeals of Arkansas
Division III
Opinion delivered May 14, 2003

*Carol Gillespie*, for appellant.

*R. Bryan Tilley*; and *Paul Petty*, for appellees.

JOHN F. STROUD, JR., Chief Judge. This appeal is from a Cleburne County jury verdict awarding appellees Tommy Adams and Beatrice Adams, individually and as administratrix of the estate of James L. Adams, deceased, $100,000 against appellant Gordon Costner. The case arises from a long-running and violent land dispute that resulted in the death of James and the shooting of his son, Tommy. We hold that the jury's verdict is supported by substantial evidence and affirm.

*Procedural History*

In the mid-1990s, James and appellant went to court over appellant's dozing of Stoney Point Drive, which runs between two parcels of land owned by James. The judge found that appellant had the right to maintain the road and entered a mutual restraining order prohibiting the parties from harassing each other, noting that they had behaved immaturely and had used poor judgment. James and another son, Carl, were later held in contempt for violating this order by threatening appellant's children with a gun.

On January 29, 1998, appellant encountered James and Tommy along their fence line by the side of the road. After the parties exchanged words, appellant went back to his house, where he called the sheriff and told him that there was going to be trouble, picked up a gun, and permitted Brent Grissom, who worked for appellant's business, to accompany him back to the scene of the dispute. At the same time, Tommy returned to his house, told his mother to call 911, and picked up a shotgun before returning to the scene. Within a few minutes after appellant, Brent, and Tommy returned, Brent, using appellant's gun, shot

James and Tommy. James died at the scene, and Tommy was treated for a shoulder wound.

Appellees filed this suit against appellant and Brent, alleging assault, battery, negligence, and civil liability for violation of a criminal statute. Many of Beatrice's claims against appellant asserted vicarious liability, under the doctrine of *respondeat superior*, for Brent's actions. At trial, appellant presented evidence that Brent was not an employee of appellant but of appellant's corporation, Costner Equipment Sales & Rental, Inc. He also introduced undisputed evidence that, at the time of the shooting, Brent's work day had ended, and he was working on his own truck when appellant returned to call the sheriff. According to Brent, he chose to accompany appellant to the scene of the dispute because he knew that appellant was a hothead, and he hoped to have a calming influence on him. Brent testified that he used appellant's gun to shoot James and Tommy after James aimed a rifle at appellant. On the other hand, Tommy testified that shots rang out after appellant raised a long piece of wood over his head and acted as if he was going to hit Tommy with it. Brent verified that appellant picked up the piece of wood before James aimed the rifle at appellant.

The trial judge denied appellant's motions for directed verdict, and the jury awarded appellees $100,000 against appellant and Brent. The verdict was entered against appellant and Brent jointly and severally. Brent has not appealed from the judgment entered on the verdict. Appellant argues on appeal that the trial judge erred in denying his motions for summary judgment and for directed verdict.

### Summary Judgment

We cannot address the summary judgment issue. The denial of a motion for summary judgment is not an appealable order; even after there has been a trial on the merits, the denial order is not subject to review on appeal. *Bharodia v. Pledger*, 340 Ark. 547, 11 S.W.3d 540 (2000); *Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991).

## Directed Verdict

█ Our standard of review for the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence, which is evidence that goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *D'Arbonne Constr. Co. v. Foster*, 80 Ark. App. 87, 91 S.W.3d 540 (2002). In determining whether there is substantial evidence, we view the evidence in the light most favorable to the party against whom the verdict is sought and give the evidence its strongest probative force. *Id.*

█ The jury rendered a general verdict that stated: "We, the jury, find for the Plaintiffs on their Complaint against the Defendants, Gordon Costner and Brent Grissom, and assess their damages in the amount of One Hundred Thousand ($100,000.00) Dollars." When the jury's verdict is rendered on a general verdict form, it is an indivisible entity or, in other words, a finding upon the whole case. *JAG Consulting v. Eubanks*, 77 Ark. App. 232, 72 S.W.3d 549 (2002). We will not speculate on the basis of a jury's general verdict. *Esry v. Carden*, 328 Ark. 153, 942 S.W.2d 846 (1997). When special interrogatories are not requested, we are left in the position of not knowing the basis for the jury's verdict and will neither question nor theorize about the jury's findings. *Id.* Therefore, we have no way of knowing the basis upon which the jury awarded damages[1]; even if appellees established only one claim, the verdict must be affirmed.

## Respondeat Superior

We agree with appellant that he cannot be liable for Brent's actions under the doctrine of *respondeat superior* because appellees did not establish that Brent worked for appellant. Although Brent testified that he had occasionally helped with appellant's cattle, his payroll records clearly demonstrate that his employer was appellant's corporation.

---

[1] Appellant has not challenged the amount of the damages awarded. We also note that the time to object to any irregularity in the verdict form is prior to the discharge of the jury. *Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996). Appellant failed to make such an objection.

Even if appellees had proved that Brent was appellant's employee, the doctrine of *respondeat superior* has no application in this case. Brent testified that his work hours were from 7:00 - 7:30 a.m. to 3:30 - 4:00 p.m. and that his duties included repairing heavy equipment, sandblasting, painting, and "whatever [appellant] needed around the shop." Brent stated that when appellant came back to call the sheriff around 4:20 p.m., his work day had ended and that he was working on his personal vehicle.

■ The doctrine of *respondeat superior* assigns liability to an employee's expected acts that are incidental to the employee's duties or that benefit the employer; liability attaches when an employee commits a foreseeable act within the scope of his employment at the time of the incident. *Porter v. Harshfield*, 329 Ark. 130, 948 S.W.2d 83 (1997). The scope of employment includes acts done with the object and purpose of the enterprise and not acts that are strictly personal. *Id.* In *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 49 S.W.3d 107 (2001), the supreme court held that a nursing home was not liable under the theory of *respondeat superior* for a nursing assistant's sexual assault of a patient. Following *Porter v. Harshfield, supra*, the court held that the nursing assistant was not, "by any stretch of the imagination, acting within the scope of his duties" when he assaulted the patient, even though his job duties included bathing her. 345 Ark. at 567, 49 S.W.3d at 115. Describing the nursing assistant's actions as "purely personal," the court held that they were not expectable in view of his duties as a nursing assistant. *Id.*

■ In light of these decisions, there is no evidence to support holding appellant vicariously liable for Brent's actions. However, as explained below, there is substantial evidence to support the verdict based on appellant's own conduct.

*Facts*

Lewis Short, the 911 dispatcher who took appellant's call, testified that, after appellant related the problem, he (Short) advised appellant not to return to the scene until a deputy arrived. He said that appellant responded, "I know there's going to be problems." Robbie Cooper, a marshal, testified that when he arrived at the scene, James pointed at appellant and Brent and stated, "he shot us," and "he ordered him to." Brent testified that

he had known appellant to be hot-headed and that when appellant came back to call the sheriff to prevent James and Tommy from blocking the road, he offered to go back to the scene to be a "calming influence" on him. He stated that appellant told him to stay in the car because he was afraid for his safety.

Brent testified that he noticed a .357 Ruger Black Hawk gun lying between the car seats on the way to the scene. Brent said that when they arrived at the scene, he stayed in the car as appellant got out; that James was on the side of the road tying a fence wire and would not stop doing so when appellant told him to stop; that appellant then got "excited and upset" and told Tommy to make his father stop because a dozer was coming in; that Tommy kept looking down at a "one-by-four" on the ground; that appellant grabbed the one-by-four and pulled it back behind his back; and that James then climbed over the fence. Brent testified that, at that point, he could "feel something was wrong"and he pulled the gun out of its holster; that as James slowly walked about twenty feet toward a tree, Brent left the car and walked parallel to James; and that appellant was still holding the piece of wood. Brent said that a few seconds after appellant threw the wood away, James picked up a shotgun; that Brent yelled at appellant to get down because James had a gun; that Brent pulled the pistol up and told James to drop the gun; and that James dropped to one knee, pulled the shotgun up to his shoulder, "drew down on" appellant, took the safety off, and "pulled down on a bead." Brent stated that as he again told James to drop the shotgun, appellant ran for the car, and James touched the trigger. At that point, Brent said, he shot James just below the ribs on his left side because he did not want to kill James, just put him on the ground.

Brent testified that he then told Tommy to get on the ground, and that Tommy did not do so, but came toward Brent. Brent said that he then saw James get back up on one knee and that he saw Tommy reaching behind his back, inside his shirt. He said that he again told Tommy to get down, and that Tommy lunged at him. Brent said that he then shot Tommy in the shoulder because he did not want to kill him, just put him on the ground. He said that James then aimed the shotgun at him again, and that he shot James in the chest.

Appellant admitted that he returned to the scene with his gun, even though he knew the confrontation could involve gunplay, in order to prevent James and Tommy from putting the fence up. He also admitted that he picked up and raised the board as he told Tommy to make his dad stop violating the previous court order.

Tommy testified that when appellant returned to the scene, he jumped out of the car, cursed at him and his father, and picked up a board, raising it over his head as if to swing it at Tommy. Tommy said that, after he and James had been shot, appellant said: "Did you get 'em?" and Brent replied, "I got 'em both."

### Assault and Battery

Assault has been defined as an intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery. 6 AM. JUR. 2D *Assault and Battery* § 1 (1999). Battery is a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person. 6 AM. JUR. 2D *Assault and Battery* § 3 (1999). Liability for an assault or assault and battery is not necessarily restricted to the actual participants; any person who is present, encouraging, or inciting an assault and battery by words, gestures, looks, or signs, or who by any means approves the same, is in law deemed to be an aider and abettor and liable as a principal, and such person assumes the consequences of the act to its full extent as much as the party who does the deed. *Hargis v. Horrine*, 230 Ark. 502, 323 S.W.2d 917 (1959).

Clearly, appellees proved that appellant is liable for assault in picking up the piece of wood, raising it, and preparing to swing it at Tommy. Additionally, Brent obviously committed battery against Tommy and James. The evidence, therefore, supports a finding that appellant aided and abetted the battery. The verdict can be affirmed on this basis.

## Civil Liability for Violation of a Criminal Statute

Arkansas Code Annotated section 16-118-107 (Supp. 2001), which was enacted in 1997, provides:

> (a)(1) Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.
>
> (2) The burden of proof for showing conduct that constituted a felony shall be a preponderance of the evidence.
>
> (3) If the person who is injured or damaged prevails, he or she shall be entitled to recover costs and attorney's fees.
>
> (b) The action may be maintained by the person who was injured or damaged or, after the person's death, the executor, administrator, or representative of his or her estate.
>
> (c) The remedy provided in this section shall be in addition to any other remedies in law or equity.

Beatrice asserted in her complaint that this statute provided civil liability for the defendants' violations of "Ark. Code Ann. § 5-10-101 *et seq.*" and "§ 5-2-403." Arkansas Code Annotated section 5-10-101 (Repl. 1997), which deals with capital murder, and section 5-10-102, which addresses murder in the first degree, do not apply here. Although murder in the second degree, addressed in section 5-10-103, might apply, manslaughter, which is covered by section 5-10-104, clearly applies to Brent's actions. It provides in part:

> (a) A person commits manslaughter if:
>
> (1) He causes the death of another person under circumstances that would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believes them to be;
>
> . . . .
>
> (3) He recklessly causes the death of another person . . . .

Arkansas Code Annotated section 5-2-402 (Repl. 1997) provides that a person is criminally liable for the conduct of another

person when he is an accomplice of another person in the commission of an offense. Section 5-2-403 states in relevant part:

> (a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:
> (1) Solicits, advises, encourages, or coerces the other person to commit it; or
> (2) Aids, agrees to aid, or attempts to aide the other person in planning or committing it; or
> (3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

 The evidence supports findings that Brent committed manslaughter and that appellant was his accomplice. Therefore, the verdict can also be affirmed on this ground.

### Negligence

 To establish a prima facie case in tort, a plaintiff must show that damages were sustained, that the defendant was negligent, and that such negligence was a proximate cause of the damages. *J.E. Merit Constructors, Inc. v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001); *Ouachita Wilderness Inst. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997). Negligence is the failure to do something that a reasonably careful person would do, and a negligent act arises from a situation where an ordinarily prudent person in the same situation would foresee such an appreciable risk of harm to others that he would not act or at least would act in a more careful manner. *Tedder v. Simmons First Bank of NWA* (unpublished opinion, February 19, 2003). In order to prove negligence, there must be a failure to exercise proper care in the performance of a legal duty that the defendant owed the plaintiff under the circumstances surrounding them. *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997). The question of what duty, if any, is owed by one person to another is always a question of law. *Heigle v. Miller*, 332 Ark. 315, 965 S.W.2d 116 (1998). Proximate cause is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Chambers v. Stern*, 347 Ark. 395, 64 S.W.3d 737 (2002), *cert. denied*, 536 U.S. 940 (2002). When there is evidence to establish a

causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *Id.* Proof of the violation of a criminal statute is evidence tending to show negligence. *Wilson v. Coston*, 239 Ark. 515, 390 S.W.2d 445 (1965).

 The mutual restraining order established appellant's duty not to engage in confrontations with James and Tommy; appellant knowingly breached this duty. As the gun that killed James and wounded Tommy was the one that appellant brought back to the scene, appellees established a causal connection between appellant's negligence and the damage. Thus, the verdict can also be affirmed on the negligence claim.

Affirmed.

ROBBINS and CRABTREE, JJ., agree.