2012 Ark. 55

Theresa Enuart PAULINO and
Eddie Paulino, Appellants

v.

QHG OF SPRINGDALE, INC., d/b/a
Northwest Medical Center and North-
west Arkansas Hospitals, LLC, d/b/a
Northwest Medical Center, Appellees.

No. 11–26.

Supreme Court of Arkansas.

Feb. 9, 2012.

Rehearing Denied March 15, 2012.

Frank H. Bailey, Sach D. Oliver, Timothy Ryan Scott, Bentonville, Brian Gene Brooks, Greenbrier, David H. Williams, Little Rock, Robert B. Leflar, Fayetteville, for appellant.

Walker Dale Garrett, Shannon L. Faint, Vincent O. Chadick, Fayetteville, Brian D. Malkmus, Debra Liane Gullett, Springfield, MO, Elisa M. White, Little Rock, L. Kyle Heffley, Rogers, for appellee.

ROBERT L. BROWN, Justice.

The instant appeal involves an action filed by appellants Theresa Paulino and Eddie Paulino, husband and wife, against appellees QHG of Springdale, Inc., d/b/a Northwest Medical Center and Northwest Arkansas Hospitals, LLC, d/b/a Northwest Medical Center (collectively, NMC) for negligent credentialing and negligent retention. The circuit court granted summary judgment in favor of NMC. We affirm.

The facts are these. On November 17, 2006, Dr. Cyril Raben performed a cervical diskectomy and fusion surgery on Mrs. Paulino's spine. A follow-up scan showed failure of the fusion in the C6–7 region and that two screws used to hold medical hardware in place were backing out or shifting out of place. After looking at these scans, Dr. Raben recommended that Mrs. Paulino schedule a second surgery to remove the medical hardware and replace it with newer hardware. According to the Paulinos, the purpose of the second surgery was to replace the medical hardware, remove bone spurs, and attempt to fuse the region where the earlier fusion had failed.

The second surgery occurred on December 17, 2007. After the surgery, Mrs. Paulino complained of extreme pain in her neck and shoulders and told the nurses that she could not feel anything below her chest. A CT scan was performed on Mrs. Paulino's cervical spine, and the radiologist found that part of the medical hardware replaced by Dr. Raben was extending into the spine's central canal and was likely contributing to the impingement of Mrs. Paulino's spinal cord. The radiologist also found that a bone was extended into the epidural space approximately five to seven millimeters. After reviewing the CT scan, Dr. Raben performed a third surgery on Mrs. Paulino. The third surgery was also performed on December 17, 2007. After that surgery, Mrs. Paulino could barely move her arms, had pain in her neck, and could not feel her legs. At the time the

appeal was filed, Mrs. Paulino remained unable to walk.

The Paulinos filed their first complaint against Dr. Raben and his employer, Arkansas Spine and Orthopedic Association, LLC (NWA Spine Clinic) and alleged that Dr. Raben was negligent and that his employer was vicariously liable for that negligence. The Paulinos amended their complaint a total of five times. In the second amended complaint, they asserted new claims against three new defendants: QHG of Springdale d/b/a Northwest Medical Center; Melanie Richard, R.N.; and American Intraoperative Monitoring, LLC (AIM). The Paulinos maintained their claims for medical negligence against Dr. Raben and NWA Spine Clinic but added claims for medical negligence against Richard, the monitoring nurse, and AIM. According to the second amended complaint, Richard negligently failed to communicate the loss of lower-extremity response to Dr. Raben. The complaint further alleged that AIM was "an employer of Richard and was vicariously liable for her negligence." The Paulinos also asserted a claim for negligent credentialing against NMC and a claim against AIM for the negligent hiring, supervision, and training of Richard.

Dr. Raben and NWA Spine Clinic were dismissed from the litigation after reaching a settlement with the Paulinos. Richard and AIM were likewise dismissed after reaching a settlement. After these parties were dismissed, the Paulinos filed a third amended complaint. In this complaint the parties making up NMC were named as the defendants. The Paulinos alleged that NMC negligently credentialed Dr. Raben. In support of this claim, the Paulinos asserted that NMC first credentialed and granted privileges to Dr. Raben to per-

form orthopedic surgery in 1998, although the complaint alleged that he was never credentialed to perform cervical corpectomies. Since that time, NMC had re-credentialed Dr. Raben every two years. The complaint further alleged that NMC knew that Dr. Raben was performing cervical corpectomies and that NMC knew he was not competent to perform such surgeries. The Paulinos contended that NMC's credentialing policies and its complacency in allowing Dr. Raben to perform surgeries for which he was not credentialed or competent to perform led to their damages.

In their third amended complaint, the Paulinos pled several causes of action based in negligence against NMC relating to NMC's oversight of Dr. Raben and Richard. The Paulinos added a plea for declaratory judgment and damages and sought to revoke Dr. Raben's privileges at NMC.

They subsequently filed two more amended complaints. The final complaint in this case, the fifth amended complaint, asserted claims against NMC, John Doe 1, John Doe 2, and/or John Doe 3. The causes of action asserted were negligence, corporate negligence, negligent credentialing, negligent selection, negligent retention, lack of informed consent, and outrage. All of the negligence counts related to NMC's negligently permitting Dr. Raben to perform surgery on Mrs. Paulino and negligently permitting Richard to monitor that surgery. The Paulinos also requested punitive damages.[1]

On July 8, 2010, NMC moved for summary judgment and contended that no cause of action exists against NMC under the Arkansas Medical Malpractice Act or in Arkansas's common law for negligent credentialing or corporate negligence with

---

1. NMC sought to remove the case from state court to federal court on December 18, 2009. The Paulinos opposed removal and moved to remand, which the federal court granted on February 10, 2010.

respect to independent contractors. NMC added in its motion that, were the circuit court to recognize a cause of action for negligent credentialing, NMC would still be entitled to summary judgment based on the immunity granted to it under the Arkansas Peer Review Statute and the federal Healthcare Quality Improvement Act (HQIA) that protects hospitals in connection with credentialing and privileging. NMC further asserted that a third alternative basis for summary judgment was that the Paulinos could not meet their burden of proof because they could not prove two essential elements of a negligence action, which are standard of care and causation. NMC contended that it was entitled to summary judgment on the Paulinos' claim of outrage and for punitive damages because the facts alleged by the Paulinos did not rise to the level required. NMC, similarly, moved for summary judgment on the causes of action relating to Richard, arguing that she was the employee of an independent contractor, AIM, and not an independent contractor herself. Thus, NMC contended that it could not be held liable for negligent hiring, supervision, or retention of Richard.

The Paulinos responded and asserted that negligent credentialing was recognized under Arkansas's Medical Malpractice Act, because it was a "medical injury." They further contended that negligent credentialing was a "long-recognized theory of recovery for direct negligence" against a hospital for violation of a duty owed to its patients that should be recognized in Arkansas. They added that Arkansas's Peer Review Statute did not immunize NMC's governing board for credentialing decisions, because it only protects hospital medical staff who are members of the peer review committee. Furthermore, they claimed that the federal HQIA did not immunize credentialing decisions, because it carved out an exception for state-law malpractice claims based on a provider's negligent treatment or care. They maintained that they could prove causation, because the proximate cause of Mrs. Paulino's injuries was NMC's decision to credential Dr. Raben. As a final point, they asserted that, although Richard was an employee of AIM, she was also an independent contractor and that NMC was liable for negligence in employing her.

The circuit court granted summary judgment to NMC on all of the Paulinos' claims. Specifically, the circuit court found that, as a matter of law, the Medical Malpractice Act did not confer a cause of action for negligent credentialing. The circuit court also found that it was the job of a hospital's peer review committee to determine whether doctors have complied with the standard of care and questioned how a jury could make an intelligent decision about a hospital's credentialing decisions when Arkansas's Peer Review Statute provides a hospital with a "privilege" for those decisions. Accordingly, the court concluded that a cause of action for negligent credentialing does not exist in Arkansas. In addition, the court determined that NMC was immunized under the HQIA and that no exceptions applied, because negligent credentialing is not part of a negligent treatment or care claim. *See* 42 U.S.C. § 11115(d). The circuit court ultimately agreed with NMC that the Paulinos could not show causation, because Mrs. Paulino—not NMC—selected Dr. Raben to perform the surgery and Dr. Raben had selected the hospital for the surgery. The circuit court next found that the facts alleged were insufficient to support a cause of action for outrage or punitive damages, and it dismissed all claims concerning Richard, because NMC was not her employer.

The Paulinos urge on appeal that the circuit court erred in finding that Arkansas does not recognize a cause of action for

negligent credentialing under the Medical Malpractice Act or at common law. The Paulinos urge, in the alternative, that Arkansas should recognize a new tort for negligent credentialing, using the analysis set out in *Larson v. Wasemiller*, 738 N.W.2d 300 (Minn.2007). They assert, in addition, that the circuit court erred in interpreting the HQIA to provide immunity to NMC, that the circuit court interpreted the causation element of their claim incorrectly, and that they properly stated a claim for outrage and punitive damages. They also challenge the dismissal of all claims concerning NMC's use of Richard, arguing that Richard was an independent contractor of NMC.

The issue of whether a cause of action for negligent credentialing is a new tort or one that falls within the ambit of the Medical Malpractice Act is an issue of law. A circuit court's conclusions of law are not given deference on appeal. *Hill v. Kelly*, 368 Ark. 200, 207, 243 S.W.3d 886, 890–91 (2006). The circuit court in its order for summary judgment concluded that Arkansas's Medical Malpractice Act does not confer a cause of action for negligent credentialing. The circuit court did not give its reasoning for that conclusion in its order. Nevertheless, we agree.

By its terms, the Medical Malpractice Act applies to all causes of action for "medical injury." Ark.Code Ann. § 16–114–202 (Repl.2006); *see also Pastchol v. St. Paul Fire & Marine Ins. Co.*, 326 Ark. 140, 144, 929 S.W.2d 713, 714 (1996). Under the Act, an action for medical injury means "any action against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury." Ark.Code Ann. § 16–114–201(1) (Repl.2006). A medical care provider includes a hospital. Ark. Code Ann. § 16–114–201(2). A "medical injury" is defined as

any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services; or from rendition of such services without informed consent or in breach of warranty or in violation of contract; or from failure to diagnose; or from premature abandonment of a patient or of a course of treatment; or from failure to properly maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services.

Ark.Code Ann. § 16–114–201(3).

This court has discussed the parameters of "medical injury" in several of our cases. In *Bailey v. Rose Care Center*, for example, an eighty-nine-year-old nursing-home resident was killed when he left the nursing home unnoticed in his wheelchair and was subsequently struck by a pickup truck. 307 Ark. 14, 15–16, 817 S.W.2d 412 (1991). The circuit court gave Arkansas Model Jury Instruction 1501 to the jury, regarding "medical injuries." *Id.* at 18, 817 S.W.2d at 414. We held that this was error, because there was no "medical injury." Accordingly, instructing the jury on AMI Civ. 1501 was prejudicial and likely misleading, because the instruction included the wrong standard of care. *Id.* at 19, 817 S.W.2d at 415.

In the same vein, in *McQuay v. Guntharp*, we held that a physician's act of fondling a female patient during a medical exam did not constitute a "medical injury" because the act was outside the doctor's treatment and provision of services. 336 Ark. 534, 541, 986 S.W.2d 850, 853 (1999). Revealing confidential information also does not constitute a "medical injury." *Wyatt v. St. Paul Fire & Marine Ins. Co.*, 315 Ark. 547, 868 S.W.2d 505 (1994) (hold-

ing that a breach of patient-doctor confidentiality is an action in negligence, not malpractice). This court has also held that there was no "medical injury" where a patient alleged that a clinic negligently allowed a romantic affair to continue between its receptionist and her husband. *Howard v. Ozark Guidance Ctr.*, 326 Ark. 224, 225, 930 S.W.2d 341 (1996) (holding that the statute of limitations applicable to negligence actions applied, not the limitations provision for medical-malpractice actions).

On the other hand, in *Sexton v. St. Paul Fire & Marine Ins. Co.*, this court found that the use of a restraint vest on a patient constituted a professional service. 275 Ark. 361, 631 S.W.2d 270 (1982). In *Sexton*, a mentally confused eighty-one-year-old man was admitted to the Nevada County Hospital. *Id.* at 362, 631 S.W.2d at 271. He fell several times while he was in the hospital, and the nurses found him trying to climb out of bed on several occasions. *Id.*, 631 S.W.2d at 271. As a result, his doctor authorized use of a restraint vest "as needed for safety" but allowed the nurses to make the final decision regarding use. *Id.*, 631 S.W.2d at 271. No vest was ever placed on the patient during his stay. *Id.*, 631 S.W.2d at 271. He fell again, fracturing his hip and shoulder. *Id.*, 631 S.W.2d at 271. When he died several months later, his estate sued the hospital, alleging that it was negligent for failing to place him in a vest. *Id.*, 631 S.W.2d at 271. Because only a doctor could authorize the use of a restraint vest, this court held that it required the expert judgment of a healthcare provider and constituted a professional service. *Id.* at 363, 631 S.W.2d at 272. Although this court held that the patient had suffered a "medical injury," and so the estate could file a lawsuit against the hospital under the Medical Malpractice Act, we affirmed the directed verdict in favor of the hospital, because the estate failed to present evidence of the degree of skill used by other hospitals in the same or similar locality as required. *Id.* at 362–63, 631 S.W.2d at 271. There was no discussion about the employment relationship between the hospital and the doctor authorizing use of the restraint vest.

■ From these decisions, we can determine that in order to constitute a "medical injury" under the Medical Malpractice Act, the injury must be the result of (1) a professional service, (2) a doctor's treatment or order, or (3) a matter of medical science. *Howard*, 326 Ark. at 228, 930 S.W.2d at 343. Although the injury to Mrs. Paulino was the result of a doctor's treatment, this court has consistently rejected claims that an injury constituted a "medical injury" when the injury did not originate with a doctor's order. *Compare Bailey*, 307 Ark. 14, 817 S.W.2d 412, *and Wyatt*, 315 Ark. 547, 868 S.W.2d 505, *with Sexton*, 275 Ark. 361, 631 S.W.2d 270.

■ In the case at hand, the decision to credential Dr. Raben was not, at its genesis, a decision to pursue a method of treatment, care, or course of medical action relating to a specific patient. Because of this, we hold that the circuit court did not err in determining that the Medical Malpractice Act does not confer a cause of action for negligent credentialing as a "medical injury" due to the fact that credentialing decisions do not involve a professional service, doctor's treatment or order, or a matter of medical science related to specific patient care.

■ The fact that we conclude that the Medical Malpractice Act does not confer a cause of action for negligent credentialing, however, does not end the inquiry. The question remains whether Arkansas should recognize negligent credentialing as a new brand of negligence under its common law. In *Bailey*, this court held that

no "medical injury" was involved in the case of the escaping patient, and, therefore, the heightened standard of care enunciated in the Medical Malpractice Act did not apply. Instead, this court observed that the proper standard of care was an ordinary-negligence standard. *Bailey*, 307 Ark. at 19, 817 S.W.2d at 414–15. Likewise, in *Howard*, this court found that breach of confidentiality was negligence, but not medical malpractice, and so the statute of limitations for ordinary-negligence actions applied. *Howard*, 326 Ark. at 228, 930 S.W.2d at 343. In *McQuay*, this court found that there was no "medical injury" involved with the improper fondling of a patient but that the complaint had stated a cause of action for outrage. *McQuay*, 336 Ark. at 537, 986 S.W.2d at 851. These cases graphically illustrate that where a complaint states a cause of action for either ordinary negligence or another tort, the failure to state a claim for "medical injury" under the Medical Malpractice Act may not be fatal.

In the instant case, part of the basis for NMC's motion for summary judgment was that negligent credentialing was not a cognizable claim under either the Medical Malpractice Act or at common law. Reviewing the pleadings, it is clear to this court that the Paulinos have alleged a cause of action for negligence under the rubric of negligent credentialing, in addition to one for "medical injury" under the Medical Malpractice Act, as the basis for their claim against NMC. Negligent credentialing does not fall squarely within the parameters of those negligence torts currently recognized in Arkansas such as negligent hiring, negligent retention, negligent supervision, or negligent hiring of an independent contractor. The issue, therefore, becomes whether this court should extend its current negligence jurisprudence and recognize a direct cause of action against NMC specifically related to negligent credentialing and the harm done to Mrs. Paulino.

This court historically treads cautiously when deciding whether to recognize a new tort. We have said that we are especially averse to creating a new tort that would only lead to duplicative litigation and encourage inefficient relitigation of issues better handled within the context of the core cause of action. *Goff v. Harold Ives Trucking Co., Inc.*, 342 Ark. 143, 151, 27 S.W.3d 387, 391 (2000) (citing *Trevino v. Ortega*, 969 S.W.2d 950 (Tex. 1998)). We have also said recently that we will decline to recognize a new cause of action if there are other sufficient avenues, short of creating a new cause of action, that serve to remedy the situation for a plaintiff. *Dowty v. Riggs*, 2010 Ark. 465, 385 S.W.3d 117 (citing *Rees v. Smith*, 2009 Ark. 169, 301 S.W.3d 467).

The Paulinos urge that negligent credentialing is akin to the tort of negligent supervision of employees, which is recognized in Arkansas. *See Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 567, 49 S.W.3d 107, 115 (2001). In order to recover under a theory of negligent supervision, a plaintiff must show that an employer knew or, through the exercise of ordinary care, should have known that its employee's conduct would subject third parties to an unreasonable risk of harm. *See Regions Bank & Trust*, 345 Ark. at 568, 49 S.W.3d at 115 (citing *Sparks Reg'l Med. Ctr. v. Smith*, 63 Ark.App. 131, 976 S.W.2d 396 (1998) (rejecting a claim for negligent supervision of an employee where the employee was a newly hired and untrained nurse's aide who sexually assaulted an immobile, semicomatose female patient, because there was no notice that the employee posed such a danger and the act was not foreseeable)).

■ Likewise, the Paulinos assert that negligent credentialing is a natural extension of the tort of negligent hiring of an independent contractor, another tort recognized in Arkansas. *See Stoltze v. Ark. Valley Elec. Co-op. Corp.,* 354 Ark. 601, 607, 127 S.W.3d 466, 470 (2003) ("[A]n employer may be held liable for the conduct of a careless, reckless, or incompetent independent contractor when the employer was negligent in hiring the contractor."); *Gordon v. Matson,* 246 Ark. 533, 536, 439 S.W.2d 627, 629 (1969) (recognizing that an employer may be responsible for the negligence of an independent contractor, if the employer has undertaken to perform certain duties or activities and negligently fails to perform them thereafter or perform them in a negligent manner).

■ In addition to negligent supervision of an employee by an employer, and negligent hiring of an independent contractor, the Paulinos rely on cases recognizing a cause of action for negligent hiring or retention of an employee. From our caselaw, it appears that in order to state a claim for negligent hiring, the plaintiff must show (1) that an inadequate background check was done or there was the complete absence of a background check; (2) that a proper background check would have revealed that the employee was not qualified for the position for which he or she was hired; and (3) that if the claim is based on a criminal act by the employee, there was a direct causal connection between an inadequate background check and the criminal act for which the plaintiff is attempting to hold the employer liable. *See Porter v. Harshfield,* 329 Ark. 130, 948 S.W.2d 83 (1997); *see also Saine*

*v. Comcast Cablevision of Ark., Inc.,* 354 Ark. 492, 501, 126 S.W.3d 339, 345 (2003). Under each of these theories of recovery, the employer's liability rests upon proof that the employer knew or, through the exercise of ordinary care, should have known that the employee's conduct would subject third parties to an unreasonable risk of harm. *Saine,* 354 Ark. at 497, 126 S.W.3d at 342.

■ These causes of action in negligence brought directly against an employer for breach of the duty of ordinary care owed to third parties seem categorically different from a hospital's decision to credential a physician. For one thing, the credentialing decision, at least in the instant case, went through the process of peer review under the Arkansas Peer Review Statute. *See* Ark.Code Ann. §§ 20–9–501 to –503 (Repl.2005). Thus, a statutory system is in place for the initial and ongoing review of competency as part of the credentialing process to assure that health services are being performed in accordance with the appropriate standard of care. Ark.Code Ann. § 20–9–501(2)(A). In general, ordinary decisions by an employer to hire an employee or independent contractor are not subject to any similar statutory safeguards. Nor do we agree with the Paulinos that Arkansas's Peer Review Statute contemplates a direct cause of action against NMC due to the fact that NMC is not entitled to immunity as part of the peer review committees under the statute relating to discovery and introduction of documents and testimony into evidence. *See* Ark.Code Ann. § 20–9–503(a)(1). Rather, we find that no direct cause of action is contemplated by the immunity provisions.[2]

---

**2.** We are precluded from addressing the Paulinos' contention that Arkansas Code Annotated section 17–95–107 provides access to credentialing information by patients who bring negligent-credentialing claims because this contention was not made below. It is well settled that we will not address arguments raised for the first time on appeal. *Jordan v. Diamond Equip. & Supply Co.,* 362 Ark. 142, 154, 207 S.W.3d 525, 534 (2005).

The Paulinos rely primarily on *Larson v. Wasemiller* to provide a framework this court should use to analyze whether negligent credentialing should be recognized as a tort in Arkansas. *See Larson,* 738 N.W.2d 300 (Minn.2007). The issue in *Larson* was whether Minnesota should recognize a cause of action for negligent credentialing. *Id.* at 303. In deciding whether to recognize a common law tort, the Minnesota Supreme Court used a four-part analysis, the first part being whether the tort of negligent credentialing was inherent in, or the natural extension of, a well-established common-law right. *Id.* at 304. Because we answer this question in the negative, we need proceed no further with the *Larson* analysis. We hold, in short, that we do not find it necessary to create a new tort in order to provide a party with another remedy against a hospital premised on physician credentialing. *See Goff,* 342 Ark. 143, 150, 27 S.W.3d 387, 391. We affirm the circuit court on this point. Because we decline to recognize a cause of action for negligent credentialing, we need not address NMC's claim of immunity under the Arkansas Peer Review Statute or the federal HQIA.

Moreover, NMC would not be liable for the tort of an employee of an independent contractor like Richard. *See, e.g., Stoltze,* 354 Ark. at 607, 127 S.W.3d at 470 ("The general rule is that an employer is not responsible for the negligence of his or her independent contractor."). The Paulinos acknowledged in their complaint that Richard was an employee of AIM. Accordingly, we reject their contention that she should be considered the independent contractor instead of AIM.

With regard to the tort of outrage, we agree with the circuit court that the facts alleged, and particularly the absence of a causative link between NMC and the injury to Mrs. Paulino based on negligent credentialing, did not rise to the level of outrage. *See Crockett v. Essex,* 341 Ark. 558, 563, 19 S.W.3d 585, 589 (2000) (finding that this court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases).

In addition, since we find no direct negligence on the part of NMC due to its credentialing, it would be contrary to that decision to find that outrage did occur, when outrage requires a higher burden of proof than mere negligence. *See Crockett,* 341 Ark. 558, 19 S.W.3d 585. Finally, without an award of compensatory damages, there is no basis for punitive relief. *Bell v. McManus,* 294 Ark. 275, 277, 742 S.W.2d 559, 560, *opinion supplemented on denial of reh'g,* 294 Ark. 275, 745 S.W.2d 140 (1988) ("In the absence of an award for damages for the underlying cause of action, punitive damages are improper.").

For all of these reasons, the order of summary judgment is affirmed.

Affirmed.

GOODSON, J., not participating.